## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KAYLA ROLON, COREY GILZEAN, MICHAEL HERNANDEZ, CHRISTOPHER HUSARY, KEITH CLINGMAN, and JONATHAN PECK,<br><br>                    Plaintiffs,<br><br>v.<br><br>THE CITY OF NEW YORK, MAYOR BILL DE BLASIO, NYPD COMMISSIONER DERMOT SHEA, NYPD CHIEF TERENCE MONAHAN, AND POLICE OFFICERS THEODORE WELLS, LARS FRANTZEN (TAX ID. 936615), FIERRO (SHIELD NO. 88189), JON BRODIE (88th PRECINCT), PICHARDO (40th PRECINCT), EDUARD LUCERO, ALTAMIRANO (TAX ID 960157), BRITNEY OWENS (SHIELD NO. 26613), HEMME (SHIELD NO. 665), ANTHONY POLANCO (SHIELD NO. 11613), ERIK RODRIGUEZ (SHIELD NO. 16334), PATRICK GROSS (SHIELD NO. 21147), LUIS E. ORTIZ (SHIELD NO. 1133), N. CANALE (SHIELD NO. 10524), SGT. ROBERT DIXSON (TAX ID. 934784), SGT SCOTT HALDEMAN, SGT MIGUEL CRUZ (SHIELD NO. 181), CAPTAIN JOSEPH A. TAYLOR. AND JOHN AND JANE DOES 1-38, individually and in their official capacities,<br><br>                    Defendants. | 1:21-cv-02548 (CM)(GWG)<br><br>**SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiffs, KAYLA ROLON, COREY GILZEAN, MICHAEL HERNANDEZ, CHRISTOPHER HUSARY, KEITH CLINGMAN and JOHNATHAN PECK (collectively herein "Plaintiffs"), by and through their attorneys, The Aboushi Law Firm, PLLC, as and for their Complaint, allege as follows:

1

## PRELIMINARY STATEMENT

1. On May 25, 2020, another unarmed Black man was killed by an officer in Minneapolis. The now viral video showed the officer's grotesque indifference to George Floyd's life as he positioned his knee on George's neck for 9 minutes until he died. Other officers held George's body in place as he cried out "I can't breathe. For New Yorkers, those last words were all too familiar because when Eric Garner was choked to death by an NYPD officer, he too cried that he could not breathe. Unfortunately, neither plea stopped the inevitable and both Eric Garner and George Floyd were killed. The killing of George Floyd sparked protests all over the country as people demanded police accountability and justice. In New York, the NYPD met protestors with violence, arrest, intimidation, and retaliation in violation of their civil rights.

2. Immediately after the murder of George Floyd, multiple protests were announced and advertised throughout New York City for months and New York residents participated in the said Protests, some of which were held under the Black Lives Matter movement, which condemns systemic racism, anti-Black police violence, and use of excessive force against unarmed Black people.

3. In response to these racial justice and police accountability protest, the NYPD was permitted, encouraged and authorized to use violent, unconstitutional and unlawful measures to interfere, stop and prevent protest regarding police accountability.

4. NYPD officers engaged in the kettling of protestors, including all Plaintiffs named herein, rounding them up causing them to fall over each other. NYPD Police officers then indiscriminately beat protestors with batons and bikes while deploying pepper spray across the crowds. NYPD Officers shoved Protestors to the ground, assaulted, dragged, beat and

placed them in tight zip ties. NYPD vans and busses held protestors for several hours before transporting them to central booking for processing despite the threat and spread of COVID-19. In fact, many officers refused to wear masks and often tore off the masks off of protestors as they beat and arrested them.

5.   For Several months, Mayor Bill DeBlasio, Commissioner Shea and NYPD Chief Terrance Monahan ("City Defendants,"), sanctioned the violent and unjustified behavior even when video showed clear evidence of violent tactics and excessive force. City Defendants encouraged and authorized the violent and abusive pattern and practice of kettling, assaulting, and arresting of protestors- without justifications or fear of consequence and in direct violation of the law and the Rights of Protesters.

6.   Plaintiffs have been gravely harmed by the acts and omissions of the Defendants which resulted in the violations of their constitutional rights. As a result, the Plaintiffs seek damages for injuries they suffered at the hands of Defendants, injunctive relief to stop the acts that gave rise to the constitutional violations described herein and prevent them from again occurring, and for declaratory relief that the Defendant City's response to protests were unlawful, unjustified, and violent.

## JURISDICTION AND VENUE

7.   This Court has federal question jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3).

8.   This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

9.   Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2) as at least one of the Defendants resides in this District and a substantial part of the events and/or omissions were committed in this District.

10. Plaintiffs assert the following claims pursuant to the United States Constitution, New York Constitution, Section 42 U.S.C.§ 1983, New York State law, as well as common law.

### COMPLIANCE WITH NEW YORK GENERAL MUNICIPAL LAW

11. Plaintiffs Kayla Rolon, Corey Gilzean, Michael Hernandez, Christopher Husary, and Keith Clingman, have all complied with all requirements for asserting their claims, including filing a notice of claim, thirty days having elapsed since presentation of the claims, and compliance with GML Section 50 and the relevant subsections and all State Law Claims raised herein are asserted on their behalf.

### PARTIES

12. Plaintiff KAYLA ROLON is a resident of the City of New York, Kings County, and State of New York.

13. Plaintiff COREY GILZEAN is a resident of the City of New York, County of New York, and State of New York.

14. Plaintiff MICHAEL HERNANDEZ is a resident of the City of New York, Bronx County, and State of New York.

15. Plaintiff CHRISTOPHER HUSARY is a resident of the City of New York, Kings County, and State of New York.

16. Plaintiff KEITH CLINGMAN is a resident of the City of New York, Kings County, and State of New York.

17. Plaintiff JONATHAN PECK is a resident of the City of New York, Kings County, and State of New York.

18. Upon information and belief, Defendant Mayor BILL DE BLASIO is a resident of New York, a civil servant of the City of New York, and at all times was acting within his official

capacity as Mayor of the City of New York. As Mayor, Defendant de Blasio, at all relevant times, was and is an elected officer and the "chief executive officer of the city," NYC Charter Section 3, and had final authority to appoint and/or remove the New York City Police Commissioner. He is sued in his official and individual capacities. He directed and condoned the behavior and actions of the NYPD as stated herein.

19. Upon information and belief, Defendant DERMOT SHEA is a resident of New York, a police officer and Police Commissioner for the NYPD and City of New York at the time of the incidents described herein, and at all times was acting within his official capacity as Police Commissioner. As Police Commissioner, Defendant Shea, personally and/or through his authorized delegates, at all relevant times had final authority to promulgate and implement administrative and managerial policies and procedures, including policies and procedures as to personnel hiring, training, supervision, and discipline with respect to NYPD officers' performance of their duties, and constituted a City policymaker for whom the City is liable. He is sued in his official and individual capacities. He directed and condoned the behavior and actions of the NYPD as stated herein.

20. Upon information and belief, Defendant TERENCE MONAHAN is a resident of New York, a police officer and Chief of Department for the NYPD and City of New York, and at all times was acting within his official capacity as a police chief, which includes policymaking authority over the NYPD. He is sued in his official and individual capacities. He directed and condoned the behavior and actions of the NYPD as stated herein.

21. Upon information and belief, Defendant lieutenant THEODORE WELLS is a resident of New York, a police officer and agent for the NYPD and City of New York, and at all times was acting within his official capacity as a police officer, including but not limited to,

taking action as a police officer, in uniform, while displaying a gun and a badge. He is sued in his official and individual capacities.

22. Upon information and belief, Defendant captain JOSEPH A. TAYLOR. is a resident of New York, a police officer and agent for the NYPD and City of New York, and at all times was acting within his official capacity as a police officer, including but not limited to, taking action as a police officer, in uniform, while displaying a gun and a badge. He is sued in his official and individual capacities.

23. Upon information and belief, Defendant LARS FRANTZEN is a resident of New York, a police officer and agent for the NYPD and City of New York, and at all times was acting within his official capacity as a police officer, including but not limited to, taking action as a police officer, in uniform, while displaying a gun and a badge. He is sued in his official and individual capacities.

24. Upon information and belief, Defendant FIERRO (SHIELD NO. 88189) is a resident of New York, a police officer and agent for the NYPD and City of New York, and at all times was acting within his official capacity as a police officer, including but not limited to, taking action as a police officer, in uniform, while displaying a gun and a badge. He is sued in his official and individual capacities.

25. Upon information and belief, Defendant PICHARDO (40th PRECINCT) is a resident of New York, a police officer and agent for the NYPD and City of New York, and at all times was acting within his official capacity as a police officer, including but not limited to, taking action as a police officer, in uniform, while displaying a gun and a badge. He is sued in his official and individual capacities.

26.  Upon information and belief, Defendant EDUARD LUCERO is a resident of New York, a
police officer and agent for the NYPD and City of New York, and at all times was acting
within his official capacity as a police officer, including but not limited to, taking action as
a police officer, in uniform, while displaying a gun and a badge. He is sued in his official
and individual capacities.

27.  Upon information and belief, Defendant JON BRODIE is a resident of New York, a police
officer and agent for the NYPD and City of New York, and at all times was acting within
his official capacity as a police officer, including but not limited to, taking action as a police
officer, in uniform, while displaying a gun and a badge. He is sued in his official and
individual capacities.

28.  Upon information and belief Defendant ALTAMIRANO (TAX ID 960157), is a resident
of New York, a police officer and agent for the NYPD and City of New York, and at all
times was acting within his official capacity as a police officer, including but not limited
to, taking action as a police officer, in uniform, while displaying a gun and a badge. He is
sued in his official and individual capacities.

29.  Upon information and belief, Defendant BRITNEY OWENS (SHIELD NO. 26613), is a
resident of New York, a police officer and agent for the NYPD and City of New York, and
at all times was acting within her official capacity as a police officer, including but not
limited to, taking action as a police officer, in uniform, while displaying a gun and a badge.
She is sued in his official and individual capacities.

30.  Upon information and belief, Defendant HEMME (SHIELD NO. 665), is a resident of New
York, a police officer and agent for the NYPD and City of New York, and at all times was
acting within her official capacity as a police officer, including but not limited to, taking

action as a police officer, in uniform, while displaying a gun and a badge. She is sued in his official and individual capacities.

31. Upon information and belief, Defendant ANTHONY POLANCO (SHIELD NO. 11613), is a resident of New York, a police officer and agent for the NYPD and City of New York, and at all times was acting within his official capacity as a police officer, including but not limited to, taking action as a police officer, in uniform, while displaying a gun and a badge. He is sued in his official and individual capacities.

32. Upon information and belief, Defendant ERIK RODRIGUEZ (SHIELD NO. 16334), is a resident of New York, a police officer and agent for the NYPD and City of New York, and at all times was acting within his official capacity as a police officer, including but not limited to, taking action as a police officer, in uniform, while displaying a gun and a badge. He is sued in his official and individual capacities.

33. Upon information and belief, Defendant LUIS E. ORTIZ (SHIELD NO. 1133), is a resident of New York, a police officer and agent for the NYPD and City of New York, and at all times was acting within his official capacity as a police officer, including but not limited to, taking action as a police officer, in uniform, while displaying a gun and a badge. He is sued in his official and individual capacities.

34.

35. Upon information and belief, Defendant JOSEPH N. CANALE (SHIELD NO. 10524), is a resident of New York, a police officer and agent for the NYPD and City of New York, and at all times was acting within his official capacity as a police officer, including but not limited to, taking action as a police officer, in uniform, while displaying a gun and a badge. He is sued in his official and individual capacities.

36. Upon information and belief, Defendant PATRICK GROSS (SHIELD NO. 21147), is a resident of New York, a police officer and agent for the NYPD and City of New York, and at all times was acting within his official capacity as a police officer, including but not limited to, taking action as a police officer, in uniform, while displaying a gun and a badge. He is sued in his official and individual capacities.

37. Upon information and belief, Defendant SGT. ROBERT DIXSON (TAX ID. 934784) is a resident of New York, a police officer and agent for the NYPD and City of New York, and at all times was acting within his official capacity as a police officer, including but not limited to, taking action as a police officer, in uniform, while displaying a gun and a badge. He is sued in his official and individual capacities.

38. Upon information and belief, Defendant SGT. SCOTT HALDEMAN is a resident of New York, a police officer and agent for the NYPD and City of New York, and at all times was acting within his official capacity as a police officer, including but not limited to, taking action as a police officer, in uniform, while displaying a gun and a badge. He is sued in his official and individual capacities.

39. Upon information and belief, Defendant SGT. MIGUEL CRUZ (SHIELD NO. 181), is a resident of New York, a police officer and agent for the NYPD and City of New York, and at all times was acting within his official capacity as a police officer, including but not limited to, taking action as a police officer, in uniform, while displaying a gun and a badge. He is sued in his official and individual capacities.

40. At all times herein, Defendant City of New York was and is a municipal entity created pursuant to the laws of the State of New York. Defendant City of New York operates and maintains the New York City Police Department ("NYPD"). The NYPD is an agency, arm

and extension of the City of New York. Defendant City of New York and NYPD are the employers of the Defendant Officers and liable for their conduct.

41. At all relevant times the Defendant Officers were acting under color of State Law, including acting as police officers for the City of New York. Defendants were acting within the scope of their employment as police officers and agents for the City of New York when they engaged in the conduct described herein.

42. Officers and individuals John and Jane Does 1-38 are named individually and in their official capacity as Officials and/or Police Officers ("Defendant Police Officers" or "Officer(s)") and were at all relevant times acting under the color of state law as Police Officers. These officers engaged in conduct that violated Plaintiffs' rights, but whose identities are not yet known. They are sued in their official and individual capacities.

43. Defendant Police Officers are being sued in their individual and official capacities, as well as agents and employees of the City of New York.

## STATEMENT OF FACTS

### NYPD's Violent Response to Policing Protest in 2020

44. Protests against police violence erupted across the nation after the May 25, 2020 police killing of George Floyd, and there were loud demands for police accountability and support for the Black Lives Matter movement.

45. The Individual Defendants repeatedly corralled protestors, beat them with batons, sprayed them with pepper spray, and arrested them without lawful justification or fair warning.

46. The conduct complained of herein was the result of the acts and omissions of the Defendant City of New York and its policy making agents including former NYPD Police Commissioner Dermot Shea, Mayor Bill de Blasio and former Chief of Department of the

NYPD Terrance Monihan.

47. For several months between May 2020 and January 2021, the NYPD engaged in a pattern and practice of using violence against protestors that was encouraged, sanctioned and enforced by Defendant City, Defendant de Blasio, Defendant Shea, Defendant Monahan, and other policymaking officials.

48. On June 17, 18, and 22 of 2020, New York State Attorney General Letitia James held hearings about the New York City Police Department's Response to Demonstrations wherein she found police officers "using excessive force against protesters, including use of batons and indiscriminate use of pepper, brandishing firearms at protesters, and pushing vehicles or bikes into protesters."[1]

49. The Department of Investigation ("DOI") also conducted its own investigation and issued a report in response to the NYPD's response to the racial justice protest. [2]

50. The DOI's review of NYPD policies revealed that the NYPD did not have a policy specific to policing protests or First Amendment-protected expression. Rather, the NYPD Patrol Guide covers demonstrations in policies related to policing of "special events," such as parades; "emergency incidents," such as civil disorder; or "unusual disorder," such as riots.[3]

---

[1] New York State Office of the Attorney General, *Preliminary Report on the New York City Police Department's Response to the Demonstrations Following the Death of George Floyd* (July 2020) https://ag.ny.gov/sites/default/files/2020-nypd-report.pdf

[2] The City of New York Department of Investigation, *Investigation into NYPD Response to the George Floyd Protests* (December 2020) https://www1.nyc.gov/assets/doi/reports/pdf/2020/DOIRpt.NYPD%20Reponse.%20GeorgeFloyd%20Protests.12.18.2020.pdf

[3] Id at 35.

51. The DOI also found that "the force required to carry out a mass arrest was disproportionate to the identified threat," and "placed the burden of potential crime on a wide swath of people who had no apparent connection to that potential criminal activity." [4]

52. Upon information and belief, the NYPD does not have training or policies regarding policing protests and First Amendment activity. Instead, the NYPD relied upon the Disorder Control Guidelines ("DCG"), which is a policy governing civil unrest, riots and disorder control. Despite knowing the difference between First Amendment Free Speech and the need to protect it, Defendants instead implemented DCG protocols which, by definition, curtailed free speech.

53. The DCG relies upon militaristic tactics designed to demoralize, disperse and deter groups.

54. The NYPD uses excessive and unlawful force against protestors, including Plaintiffs, as a result of a policy, custom and practice aimed at inhibiting lawful protests and encouraging the use of excessive force, particularly protest against police misconduct.

55. The NYPD repeatedly and intentionally used tactics that were focused on disrupting and demoralizing protests and protestors rather than employing de-escalation tactics.

56. Just one example of many instances of excessive use of the police was highlighted by Human Rights Watch and SITU Research, [5] a 99-page report providing a detailed account of the NYPD's response to the June 4 peaceful protest in Mott Haven, which is a low-income, populated mostly by minorities that has experienced high levels of police brutality

---

[4] Id at 56.

[5] **US: New York Police Planned Assault on Bronx Protesters -** *Trapping, Beatings in June Crackdown Reveal Abusive, Unaccountable System.* See https://www.hrw.org/news/2020/09/30/us-new-york-police-planned-assault-bronx-protesters#

and ingrained systemic racism.[6] Plaintiff Michael Hernandez was assaulted and falsely arrested during said Mott Haven Protest.

57. On June 4, 2020, thousands of police officers surrounded and trapped protesters in a tactic known as "kettling" and beat people with their batons and used pepper spray on them before arresting over 250 peaceful protestors. This was the same tactic used in each protest attended by each Plaintiff named herein.

58. Further reports and video taken at the peaceful protest events show countless injuries sustained at the hands of law enforcement, including broken bones, sprained muscles and joints, and potential nerve damage due to overly tight zip ties.

59. The HRW report further notes that, "Most of those injured did not receive any immediate medical care, as police arrested or obstructed volunteer medics in medical scrubs with red cross insignia. Dozens of people spent hours in detention with untreated wounds and their hands bound behind their backs."[7]

60. Indeed, the NYPD has responded to protests by using unlawful force and false arrests as a matter of policy and practice and has done so on many occasions throughout the years as issues of police brutality rose to unconscionable levels.

61. Defendants knew that NYPD Officers would encounter protests against police brutality and in support of racial justice as multiple protests were announced and advertised throughout New York City for months.

---

[6] **"Kettling" Protestors in the Bronx** – *Systemic Police Brutality and its Costs in the United States.* See https://www.hrw.org/sites/default/files/media_2020/10/us_mott%20haven0920_web.pdf

[7] **US: New York Police Planned Assault on Bronx Protesters** - *Trapping, Beatings in June Crackdown Reveal Abusive, Unaccountable System.* See https://www.hrw.org/news/2020/09/30/us-new-york-police-planned-assault-bronx-protesters#

62. Defendants knew that NYPD Officers would encounter protests in response to Police killings of unarmed Black people because they have encountered protest in the past including:

    i.    In 2014, the killing of Michael Brown, an unarmed 18-year-old Black man by a Police Officer in Ferguson, Missouri[8];

    ii.    In 2014, Eric Garner was choked to death by an NYPD officer in Staten Island, New York[9];

    iii.    In 2014, Akai Gurley was shot to death by an NYPD officer in Brooklyn, New York[10];

    iv.    In 2015 the killing of Freddie Gray, an unarmed 25-year-old Black man, who died after being injured while in custody of Baltimore Police[11];

    v.    In 2016, Alton Sterling a 37-year-old Black man, was shot dead at close range by two Baton Rouge Police Department officers[12]; and

---

[8] Mosendz, Polly, *Michael Brown Protests Spread to Times Square* (August 2014) https://www.theatlantic.com/national/archive/2014/08/michael-brown-protests-spread-to-times-square/376125/

[9] The Guardian, *Eric Garner protests continue in cities across America through second night* (December 2014) https://www.theguardian.com/us-news/2014/dec/05/eric-garner-case-new-york-protests-continue-through-second-night

[10] Ransom, Jan and Schapiro, Rich, *Hundreds of protesters march in Brooklyn demanding justice for Akai Gurley* (December 2014) https://www.nydailynews.com/new-york/brooklyn/hundreds-march-brooklyn-demanding-justice-akai-gurley-article-1.2058434

[11] The New York Times, *Over 140 Arrested as New Yorkers Protest the Death of Freddie Gray* (April 2015) https://www.nytimes.com/2015/04/30/nyregion/hundreds-march-in-manhattan-to-protest-the-death-of-freddie-gray.html

[12] George, Michael, Holt, Stefan and Santia, Marc, *At least 40 Arrested as New Yorkers Protest Deadly Police Shootings* (July 2016) https://www.nbcnewyork.com/news/local/new-york-city-new-jersey-protests-deadly-police-shootings-philando-castile-alton-sterling/697693/

vi.   In 2016, Philando Castille was shot to death by Minneapolis Police, while in the passenger seat of his car while is fiancé was in the driver's seat and his 4-year-old daughter was in the back seat[13].

63. Defendants had notice, by way of media, lawsuits, social media, reports by the Civilian Complaint Review Board, Department of Investigation and others, that NYPD Officers engaged in unlawful behavior against protestors in the past using excessive force, crowd disruption tactics and arrests lacking probable cause.

64. Defendants City and NYPD have been the subject of hundreds of federal and state lawsuits and complaints alleging violations of individuals constitutional rights as a result of and failure to train and the policy and/or practice of condoning violations of constitutional rights, including that of Plaintiff's, by its police officers against protestors including: (1) failure to ensure the need for individualized probable cause for each arrest; (2) failure to provide training regarding policing protests and First Amendment activities; (3) failure to provide meaningful dispersal orders and opportunities to disperse; and (4) failure to hold officers accountable for misconduct.

65. Defendant City failed to train and supervise NYPD Officers in the appropriate way to address peaceful protesters, including the Plaintiffs, and discipline NYPD officers for misconduct, despite full knowledge of the officers' misconduct and that failing to monitor, train, discipline, and supervise officers would lead to encouraging the violation of rights and a tacit acceptance of same as a policy.

---

[13] Epstein, Emily Anne, *A week of Bloodshed in America* (July 2016) https://www.theatlantic.com/photo/2016/07/A-Week-of-bloodshed-in-America/490517/

66.  The wrongful acts or omissions complained of herein are a direct result of Defendant City's deliberate indifference to Plaintiffs' constitutional rights afforded by the First, Fourth, and Fourteenth Amendments of the United States Constitution.

67.  The City and its policy makers undertook a policy, custom, and practice of meeting peaceful protests with violence and brutality in an effort to curb lawful demonstrations and retaliate against those calling for police accountability.

68.  Defendants were each and all responsible, in whole and/or in part, for the planning for and/or creation, promulgation, implementation, and/or enforcement of the unconstitutional policies, practices and/or customs complained of herein, and/or condoned, acquiesced in, adopted, and/or approved of the same, through their acts and/or failures to act, as set forth more fully below.

69.  At all times relevant herein, as set forth more fully below, Defendants' actions and/or failures to act were malicious, intentional, knowing, and/or with a deliberate indifference to or a reckless regard for the natural and probable consequences of their acts and/or omissions.

70.  At all relevant times, the officer-defendants were engaged in a joint venture, assisting each other in performing the various actions described herein and lending their physical presence and support and the authority of their offices to one another.

71.  Each Plaintiff was peacefully protesting, as is their Constitutional right to do, and were subject to unlawful and unwarranted force and arrest.

72.  The violation of the Plaintiffs' rights were a direct result of the policies practices and procedures of Defendants City, de Blasio, Shea, and Monahan.

73. All of the wrongful acts or omissions complained of herein were carried out by the individual named and unnamed police officer defendants pursuant to: (a) formal policies, rules and procedures of Defendant City; (b) actions and decisions by Defendant City's policymaking agents including, but not limited to, Defendant de Blasio, Defendant Shea, and Defendant Monahan; (c) customs, practices, and usage of the NYPD that are so widespread and pervasive as to constitute de facto policies accepted, encouraged, condoned, ratified, sanctioned, and/or enforced by Defendant City, Defendant de Blasio, Defendant Shea, Defendant Monahan, and other policymaking officials; (d) Defendant City's deliberate indifference to Plaintiffs' rights secured by the First, Fourth, and Fourteenth Amendments of the United States Constitution, as evidenced by the City's failures, and the failures of the City's policymaking agents, to train, supervise, and discipline NYPD officers, despite full knowledge of the officers' wrongful acts, as described herein.

**The City and NYPD leadership condoned the use of force, violence, unlawful arrests and detention against protestors and failed to discipline officers for unlawful conduct**

74. Defendants City, de Blasio, Shea, and Monahan knew that without intervention or sufficient training, NYPD Officers would again continue to use the same tactics. Nevertheless, Defendants knowingly deployed thousands of insufficiently trained NYPD Officers to police the Protests and condoned their unlawful actions.

75. After an NYPD truck drove into a crowd of protesters, former Mayor de Blasio stated on May 30, 2020, "I do believe the NYPD has acted appropriately."[14] His actions of condoning unlawful behavior encouraged the violation of rights by police officers as described herein.

---

[14] Amir Vera, *Video Appears to Show NYPD Truck Plowing Through Crowd During Protest*, CNN (May 31, 2020), https://www.cnn.com/2020/05/31/us/nypd-truck-george-floyd-protest/index.html.

Further, as the Mayor, his comments sent a message that excessive force is acceptable and will be tolerated. His actions directly led to further violation of Plaintiffs' rights as described herein.

76. As police officers kettled, assaulted and falsely arrested protestors on live television, on May 31, 2020, Commissioner Shea tweeted, "In no small way, I want you to know that I'm extremely proud of the way you've comported yourselves in the face of such persistent danger."[15] His actions of condoning unlawful behavior encouraged the violation of rights by police officers as described herein. Further, as the Police Commissioner, his comments sent a message that excessive force is acceptable and will be tolerated. His actions directly led to further violation of Plaintiffs' rights as described herein.

77. Police Commissioner Dermot Shea also said that the NYPD "had a plan which was executed nearly flawlessly in the Bronx"[16]. At the same time, the Human Rights Watch ("HRW") issued a report on the NYPD's response to the Mott Haven peaceful protesting finding that NYPD conduct during the Mott Haven protest on June 4 amounts to serious violations of international human rights law including the NYPD's excessive use of force, violations of the rights to free expression and peaceful assembly, arbitrary arrests and detentions, and cruel and degrading treatment of detainees.[17]

---

[15] Commissioner Dermot Shea (@NYPDShea), TWITTER (May 31, 2020), https://twitter.com/NYPDShea/status/1267074838436425729.

[16] Margaret Garnett, Commissioner, New York City Department of Investigation, *Investigation into NYPD Response to the George Floyd Protests*, ("DOI Report"), Dec. 2020, available at https://www1.nyc.gov/assets/doi/reports/pdf/2020/DOIRpt.NYPD%20Reponse.%20GeorgeFloyd%20Protests.12.18.2020.pdf; New York City Law Department, *Corporation Counsel Report Pursuant to Executive Order 58 (June 20, 2020) Directing an Analysis of Factors Impacting the George Floyd Protests in New York City* (Dec. 2020) ("OCC Report"), https://www1.nyc.gov/assets/law/downloads/pdf/ProtestReport-np.pdf

[17] Human Rights Watch, *"Kettling" Protesters in the Bronx* (Sept 2020) https://www.hrw.org/report/2020/09/30/kettling-protesters-bronx/systemic-police-brutality-and-its-costs-united-states

78. The HRW report found that the NYPD's highest-ranking uniformed officer, Chief of Department Terence Monahan, was present during the action, along with at least 24 other uniformed supervisory officers – chiefs, lieutenants, captains, or inspectors in white shirts.

79. Chief of Department Terence Monahan personally oversaw the NYPD's response to the protests in Mott Haven alongside with a commanding officer, kettled the protesters and refused to allow them to disperse before indiscriminately engaging in unprovoked violence and arrests.[18]

80. In one video posted by the Human Rights Watch, Defendant Chief Monahan could be seen approaching one of the organizers of the Mott Haven protest to make a grab for her megaphone. Thereafter, he spoke to nearby officers who, within about a minute, formed a line and violently assaulted and arrested the protesters nearest to them.[19]

81. Mayor de Blasio said regarding the Mott Haven operation: "This is something the NYPD saw coming." In response to questioning at the June 5 press conference, Mayor de Blasio further stated: "We had observers for City Hall"[20] present at the NYPD operation in Mott Haven, who reported their accounts back to him, demonstrating the Mayor's advance knowledge of, and participation and condoning of, the planning and execution of the NYPD operation in Mott Haven that led to the violation of Plaintiffs' rights as described herein.

---

[18] **US: New York Police Planned Assault on Bronx Protesters -** *Trapping, Beatings in June Crackdown Reveal Abusive, Unaccountable System.* See https://www.hrw.org/news/2020/09/30/us-new-york-police-planned-assault-bronx-protesters#

[19] Human Rights Watch, *"Kettling" Protesters in the Bronx* (Sept 2020) https://www.hrw.org/report/2020/09/30/kettling-protesters-bronx/systemic-police-brutality-and-its-costs-united-states

[20] Jake Offenhartz, Nick Pinto, and Gwynne Hogan, *"NYPD's Ambush of Peaceful Bronx Protesters Was 'Executed Nearly Flawlessly,' City Leaders Agree,"* Gothamist, June 5, 2020, https://gothamist.com/news/nypds-ambush-of-peaceful-bronx-protesters-was-executed-nearly-flawlessly-city-leaders-agree

82. Defendants failed to discipline the vast majority of NYPD Officers who used excessive force against Plaintiffs and other prot9est attendees.

83. Out of thousands of complaints of excessive force and abuse of authority received by the CCRB, less than a third are fully investigated leaving the overwhelming majority of officers without accountability.[21]

84. Furthermore, the DOI report found that between May 28 and June 20, 2020, the CCRB had received 1,646 protest-related allegations related to 248 incidents.[22]

85. Upon information and belief, Mayor de Blasio and Commissioner Shea received regular reports from Chief Monahan, City Hall Observers and other NYPD officials regarding the manner in which the City responded to the mass protests and confirmed the same during press conferences held throughout the years 2020 and 2021.

86. Upon information and belief, Mayor de Blasio, Commissioner Shea, and Chief Monahan regularly reviewed reports documenting patterns of police misconduct, their use of excessive force, unlawful seizures, and other First-Amendment violations, including media coverage regarding the violent suppression of peaceful protestors.

87. Despite being aware of the unlawful practices of the NYPD in policing the protests, named Defendants Mayor, Commissioner Shea, Chief Monahan and the NYPD leadership deliberately failed to correct and/or prevent NYPD Officers from using the aforementioned tactics.

**NYPD's Failure to Train on Policing Protests**

---

[21] New York City Civilian Complaint Review Board, *Complaints* (Accessed October 13, 2021)
https://www1.nyc.gov/site/ccrb/policy/data-transparency-initiative-complaints.page#complaint_fado

[22] Id.

88. Defendant City of New York has failed to train and has inadequately trained officers, including Defendant Officers on how to interact with protestors and police protests without engaging in constitutional violations.

89. Defendant City has a policy and practice of deploying officers called the Strategic Response Group ("SRG") and said officers are inadequately trained, poorly supervised and undisciplined.

90. The SRG is a heavily militarized, rapid-response unit of several hundred officers tasked with dealing with public disorder events and terrorist acts.

91. The SRG are not trained to respond to peaceful protests or First Amendment activity nor is it their purpose. The deployment of SRG to protest and First Amendment activity resulted in the use of violent, aggressive, and excessive force which resulted in constitutional violations.

92. The DOI also found that "outside of SRG, the NYPD deployed officers who largely lacked any recent training related to protests and that the NYPD appeared to have deployed a large number of front-line supervisors and officers to police the Floyd protests without adequate training. [23]

93. Nonetheless, the SRG was deployed around the City at various protests throughout 2020, including those that are subject to this lawsuit, and was created to be a specialized unit that is to respond to disorder-causing events and to conduct counter-terrorism operations.[24]

---

[23] Id at 66.

[24] **"Kettling" Protestors in the Bronx –** *Systemic Police Brutality and its Costs in the United States.* See https://www.hrw.org/sites/default/files/media_2020/10/us_mott%20haven0920_web.pdf

Those events and operations are not the same as protests and therefore the SRG did not care to use any peaceful or de-escalation tactics in response to protests.

94. Despite the fact that their main tasks are counterterrorism related, the SRG has been regularly deployed at protests in support of the Black Lives Matter movement and at protests calling for police accountability.

95. Upon information and belief, the SRG members are to have additional Disorder Control Unit training, which utilizes the principles and tactics outlined in the Disorder Control Guidelines. Id.

96. However, a report by the Corporation Counsel for the City of New York noted that these officers did not receive the additional, supposedly mandatory, training – "for a majority of the officers who were assigned to the George Floyd protests, their training on policing protests was limited to what they had received as recruits in the Academy." [25]

97. According to the report issued by the Department of Investigation ("DOI"), the NYPD does not have a policy specific to policing protests or First Amendment-protected expression.[26]

98. The NYPD relies on the Disorder Control Guidelines ("DCG"), which dictates protocol pertaining to large scale gatherings, civil unrest, disorder control and riots.

---

[25] New York City Law Department, Corporation Counsel Report (Dec. 2020) ("OCC Report"), https://www1.nyc.gov/assets/law/downloads/pdf/ProtestReport-np.pdf.

[26] The City of New York Department of Investigation, *Investigation into NYPD Response to the George Floyd Protests* (December 2020) at 35 https://www1.nyc.gov/assets/doi/reports/pdf/2020/DOIRpt.NYPD%20Reponse.%20GeorgeFloyd%20Protests.12.18.2020.pdf

99. The DCG promotes military tactics designed to disperse, deter and demoralize large groups. Upon information and belief, the DCG contains no guidance regarding protest and First amendment activities.

100.    The DOI also found that the NYPD offered no comprehensive in-service training across the Department that related to policing protests at all, and the NYPD lacked standardized, agency wide, in-service training related to policing protests."[27]

101.    The DOI further concluded that the new training provided was deficient because "that scenario-based training appears focused solely or primarily on crowd control tactics and formations with no discernable reference to managing interactions, facilitating First Amendment rights, and minimizing the use of force."[28]

102.    Upon information and belief, the NYPD relied upon the DCG and SRG to respond with hostility to protestors as mentioned above and in the documents throughout the reports mentioned herein and cases cited in reference.

103.    Defendants' failure to train includes: (1) failure to ensure the need for individualized probable cause for each arrest; (2) failure to provide training regarding policing protests and First Amendment activities; (3) failure to provide meaningful dispersal orders and opportunities to disperse; (4) failure to train regarding the protection afforded to protesters under the Constitution, and (5) failure to hold officers accountable for misconduct. The Defendants knew that there was a need for such training as previous lawsuits, tort claims, litigation, complaints, media, social media, all placed Defendants on notice that there were wholesale violations of Protesters' rights as described herein, and

---

[27] Ibid.

[28] Id.

Defendants did nothing to address same, but rather encouraged it through inaction and public statements condoning the unlawful conduct of the Defendants.

104.     Defendant City's refusal to address the abuses of protestors by Police is the result of a policy, practice, custom, and procedure of the City that encouraged the use of excessive force, false arrest and imprisonment of protestors and to suppress First Amendment-protected activities by using these abusive, militaristic tactics, such as those used against Plaintiffs.

105.     The NYPD engaged in a pattern or practice whereby NYPD Officers kettled peaceful protesters, prevented them from leaving an area and stopped them from complying with dispersal orders. The practice involved the use of indiscriminate, excessive force; mass unlawful arrests of peaceful, non-resisting protesters; mass unlawful detention and arrests of protesters who were not given an opportunity to disperse from protest zones; and the overall quashing of peaceful protests.

106.     Defendants, along with other policy-making officials, knew that the NYPD officers were woefully under-trained and were not ready to properly police the mass protests. Despite the foregoing, said Defendants and policy-making officials knowingly and purposefully deployed thousands of insufficiently trained officers to police the protests.

107.     Defendants subjected Plaintiff and other peaceful protestors to Defendants' Protest Arrest Processing Policies, whereby Plaintiffs were crammed in NYPD vans with many other protestors and NYPD police officers and transported to a precinct or central booking.

108.     Defendants did not have individualized probable cause for each arrest or a basis for issuing a summons to each of the Plaintiffs.

109.      Plaintiffs, like many other protestors, were rounded up indiscriminatingly with dozens of other protestors, subject to longer processing times in custody and exposed to dangerous and unsanitary conditions of confinement with no regard to the risk and threat of COVID-19.

110.      Indeed, upon information and belief, the Defendant-officers, as well as thousands of other officers, had no training in policing peaceful demonstrations, and many had no meaningful training since the academy.[29]

111.      The policing of peaceful protesters requires that the police officers permit such protests as a Constitutional right, and not to attack, arrest, disrupt, and use force upon protesters simply because the protesters are exercising their rights.

112.      Given the clear deficiency of the training, along with the custom of tolerating unlawful arrests and brutality against protesters, the individually named and unnamed Defendant police officers violated the rights of Plaintiffs as described herein and said acts and omissions were sanctioned by Defendant City and its policymaking agents as established by their lack of action, public statements condoning the unlawful conduct, as well as the images and reports of unlawful police activity that went unaddressed for months related to officer conduct in protests.

113.      The NYPD followed through with their egregious conduct by physically restraining the protestors with flex-cuffs and zip ties, and intentionally bound them so tight that many experienced numbing pains, accompanied by possible serious, long-term nerve damage.

---

[29] New York City Law Department, Corporation Counsel Report (Dec. 2020) ("OCC Report"), https://www1.nyc.gov/assets/law/downloads/pdf/ProtestReport-np.pdf at page 31.

114.     Furthermore, the NYPD subjected protestors to a lengthy and unnecessary arrest process that put them in dangerously close quarters at a peak in the COVID-19 pandemic in New York, all the while denying protestors the basics to keep them safe, like water, masks, and hand sanitizer.

115.     Beginning in 2004, after the NYPD's use of excessive force and proactive arrest tactics were criticized, NYPD supervisors were required to routinely create "after action reports" that documented and critiqued NYPD plans for and responses to protest activities.

116.     Many of the "after action reports" went public upon media coverage of a 2006 litigation. Allen v. City of New York, 03 Civ. 2829 (KMW) (GWG) (S.D.N.Y. Jan. 3, 2007).

117.     The reports cited in media coverage praised the employment of militarized tactics, including but not limited to, employing a large number of officers in riot gear and military equipment to cause alarm amongst protestors to act as a deterrent, and even encouraged the use of 'proactive' arrests, stating that doing so would have a "powerful psychological effect" on protestors. [30]

118.     After these reports went public, rather than reassessing protest policing-related policies and tactics and continuing to issue these reports, the NYPD instead opted to stop creating the records altogether while continuing the violent, intimidating, and retaliatory practices to shut down protests.

119.     This worrisome conduct by the City of New York and the NYPD is compounded by the fact that its police officers have no fear of getting reprimanded for their improper or

---

[30] Jim Dwyer, "Police Memos Say Arrest Tactics Calmed Protest," N.Y. Times, March 17, 2006, available at https://www.nytimes.com/2006/03/17/nyregion/police-memos-say-arrest-tactics-calmed-protest.html.

excessive use of force. On the contrary, Mayor DeBlasio and Commissioner Shea continued to praise the "bravery" of the officers while remaining silent on the abusive practices- including when NYPD cruisers were driven into crowds. "I've seen that video and I've obviously heard about a number of other instances. It's inappropriate for protesters to surround a police vehicle and threaten police officers. That's wrong on its face, and that hasn't happened in the history of protests in the city," Defendant de Blasio said.[31]

120.     Despite the numerous instances of police brutality against protesters, the Hearing Report of the Attorney General and the OIG Report, no officers have been meaningfully held accountable and the Defendant City has failed to enact any meaningful changes to address the violence inflicted upon protestors by Police.

121.     New York's Attorney General Letitia James issued an initial report in July 2020, noting the dozens of eyewitness testimony from members of the public taken via video hearings in the weeks leading up to the report.[32]

122.     Further testimony included multiple accounts where the NYPD filled, "overcrowded cells without proper PPE or the ability to socially distance [and] those detained were not provided water or food."[33]

---

[31] *Mayor Bill de Blasio Addresses Video of NYPD Cruiser Driving Into Protesters: 'I Don't like What I Saw One Bit'* CBS New York, May 31, 2020, available at https://newyork.cbslocal.com/2020/05/31/nypd-drives-into-protesters/

[32] New York State Office of the Attorney General, *Preliminary Report on the New York City Police Department's Response to the Demonstrations Following the Death of George Floyd* (July 2020) https://ag.ny.gov/sites/default/files/2020-nypd-report.pdf

[33] Id.

123.     The Attorney General also took testimony from elected officials, including Senator

John Liu, who attended a peaceful protest on May 31, 2020, where he witnessed, "without

warning, officers charged the crowd and started hitting protesters with batons."[34]

124.     Public Advocate Jumaane Williams testified about his participation in a May 28,

2020 protest, where he observed "a militarized" police presence and "police wearing riot

gear and using metal barricades to surround nonviolent protesters."[35]

125.     The deliberate indifference to the rights of Plaintiffs by the City and its policy

makers caused the Plaintiffs to be assaulted, subjected to excessive force, and arrested

while exercising their constitutionally protected rights.

126.     The City and its policy makers did nothing as numerous instances of police

brutality towards protesters went viral, thereby condoning and sanctioning an ad hoc

policy for Defendant Officers to continue responding to protestors in the same manner.

127.     The predictable result of the City's failure to train their officers and interject in

the brutality of protesters directly caused the violation of Plaintiffs' rights to protest,

assembly, as well as be free from unlawful arrest, seizure, and excessive force.

128.     In another instance that went viral, Protestor Dounya Zayer was violently pushed

by an NYPD officer while his commander, Craig Edelman, watched and walked right by.

Instead of holding the police officer accountable, Commander Edelman was featured as

an example of excellent police leadership in a video by the Mayor's office.[36]

---

[34] Id.

[35] Id.

[36] Grench, Eileen and Smith, Greg B. '*NYPD Precinct Commander Ousted After Brutality Video Shows up in de Blasio Slideshow*' The City (Feb. 1, 2021) available at  https://www.thecity.nyc/2021/2/1/22261453/nypd-brutality-video-de-blasio-precinct-reform-slideshow

129.     The Defendant City also failed to train its officers that if they see other officers engaged in misconduct/unlawful activity, such as the unlawful use of force and inhibiting the exercise of free speech, protest, and assembly in this matter, they must intervene to prevent it.

130.     The Defendant City's failure to train its officers has been highlighted in the past year with numerous reports of aggressive police responses to protests across the country and in New York City.

131.     City of New York and the NYPD, including its Police Chief and superior officers, created a tacit policy and custom of permitting the Defendant-Officers' unlawful actions to continue with their imprimatur and approval.

132.     Upon information and belief, Defendant-Officers were not trained, provided additional supervision or additional monitoring of their performance specifically to prevent the unlawful use of force upon Plaintiffs and violate their rights.

*Plaintiffs Kayla Rolon and Corey Gilzean*

133.     On June 1, 2020, Plaintiffs Kayla Rolon and Corey Gilzean were peacefully and lawfully exercising their Constitutional Rights to assemble, free speech, and protest at an event in Times Square when they were surrounded by NYPD officers, including Defendant Officer Lars Frantzen and Sgt. Robert Dixson, amongst other John and Jane Doe Officers that are unknown to Plaintiffs at this time but are known to Defendants.

134.     Rolon and Gilzean were brutally shoved, attacked, beaten and subsequently arrested.

135.     Defendant NYPD police officers did not give a dispersal order, but rather, surrounded Rolon and Gilzean with other protestors to ensure that it was impossible for them to disperse.

136.    Defendant Officer Lars Frantzen and Sgt. Robert Dixson, rushed into the crowds and began beating protestors with their fists and batons.

137.    Rolon witnessed Defendant Officer Lars Frantzen swing his baton at Gilzean, and she did her best to shield him from the attack.

138.    Defendant Officer Lars Frantzen saw Rolon attempting to shield Gilzean from his assault and retaliated against Rolon by beating her with his baton instead.

139.    Plaintiff Gilzean was shoved by police officer John Doe #1 causing him to drop his bag with his personal items inside, including his wallet.

140.    Gilzean reached for his bag but was shoved by police officer John Doe #2 and told that he was not allowed to retrieve his bag.

141.    Gilzean was then forcefully shoved to the ground, where several police officer John Does #2, 3 and 4 beat Gilzean with their batons.

142.    Defendant police officer John Doe #3 held Gilzean by his dreadlocks so that he could not leave and ripped two dreadlocks from his head.

143.    Defendant police officer John Doe #4 and #5 grabbed Rolon and threw her across the street causing her head to hit the pavement.

144.    Defendant police officer John Doe #4 instructed Plaintiff Rolon to remain on the ground, or else he would continue to beat her with his baton.

145.    Sgt. Robert Dixson directed Defendant Officer Lars Frantzen to separate and arrest Rolon and Gilzean.

146.    Defendant Officers Lars Frantzen and John Doe #4 restrained Rolon and Gilzean by zip ties that were so tight that they lost feeling in their fingers, which became numb and turned blue.

147.     Rolon was taken to the 14th precinct where she was unlawfully detained for 20 hours.

148.     While in the confines of the 14th precinct, Rolon was unconstitutionally searched by Defendant Police Officers Britney Owens and Hemme.

149.     Plaintiff Gilzean was detained for about 8-9 hours.

150.     Following his detention, Gilzean was unconstitutionally arrested and issued a desk appearance ticket by Defendant Police Officer Joseph Canale.

151.     As a direct and proximate cause of Defendants' acts and omissions, Plaintiffs Rolon and Gilzean sustained numerous physical injuries, including but not limited to, cuts, scratches, and severe bruises and severe permanent emotional, physical and psychological trauma.

*Plaintiff Christopher Husary*

152.     On or about May 29, 2020 at 8:00p.m. by the Barclay's Center in Brooklyn, Plaintiff Christopher Husary, a documentary photographer and film maker, joined peaceful protestors in exercising their Constitutional Rights to protest by Dekalb Avenue, Kings County.

153.     Plaintiff Husary joined several hundred peaceful protestors while documenting the protest with his phone.

154.     Plaintiff Husary witnessed, at the police precinct on Classon and Dekalb, that there was a bus being used by Defendants to shield the police precinct and to corner protestors that were to be arrested. The peaceful protestors chanted "Hands up, don't shoot."

155.     Plaintiff Husary, on his bike, was corralled in with the protestors and Defendants, in riot gear, used their shields, batons, and pepper spray to lunge forward and attack the peaceful protestors.

156.     Defendant Police Officers Fierro, and Brodie, and John Doe #6 and Jane Doe #1, officers that are unknown to Plaintiffs at this time but are known to Defendants, did not give Plaintiff Husary or other protestors a chance to move or disperse.

157.     Defendant John Doe #6 deployed pepper spray directly at Husary's face causing him pain, difficulty breathing and stinging.

158.     Defendant Sergeant Miguel Cruz told Defendant Police Officer Brodie, in sum and substance, to arrest Husary, in violation of his First and Fourth Amendment rights. There was no probable cause or other legal justification for the arrest of Plaintiff, and the goal of arresting him was to violate his right under the first Amendment.

159.     Defendant Officer John Doe #6 and Jane Doe #1 beat Plaintiff Husary with their batons without cause, with the named and John Doe officers failing to intervene.

160.     Defendant John Doe police officers #6, #7 and #8 punched Plaintiff Husary and hit his hands with batons to force him to let go of his bicycle.

161.     Defendant Officer John Doe #9 violently arrested Plaintiff Husary.

162.     Eventually, Plaintiff Husary released his hold on his bicycle due to the severe pain he was experiencing from Defendant John Does #6-8 having hit his hands repeatedly with batons.

163.     Defendant Officers Fierro and Jon Brodie slammed Plaintiff Husary's head into the ground causing his tooth to chip and his hands were then cuffed tightly.

164.     Defendant Officers Fierro and Jon Brodie took Husary to the 88th precinct and detained him for approximately 15 hours.

165.     At the precinct, Husary attempted to use his hand sanitizer while at the precinct and an officer snatched it out of his hands and threw it to the ground and refused to permit Husary to wash his hands for sanitation purposes, nor did he permit him to wash off the pepper spray.

166.     Plaintiff Husary suffered multiple open wounds, swollen knees, and severe bruising.

167.     Plaintiff Husary still experiences pain when using his hands and suffers from headaches, and his tooth is also chipped as a result of being slammed into the ground.

168.     Furthermore, Plaintiff Husary's vintage Italian 1980's bicycle, which he found the next day, was completely totaled and unsalvageable.

169.     As a result of Defendants' conduct, Plaintiff Husary demands judgment against Defendants in a sum of money to be determined at trial including compensatory and punitive damages along with costs and attorney's fees.

*Plaintiff Michael Hernandez*

170.     Plaintiff Hernandez was exercising his Constitutional right to peacefully protest and joined other protestors on June 4, 2020 in the Bronx, New York.

171.     Defendant Police Officers, including Pichardo, Eduard Lucero, Sgt. Scott Haldeman, and John and Jane Doe Officers that are unknown to Plaintiffs at this time but known to Defendants, pushed the crowd of protestors in the front with their bikes and began indiscriminately assaulting and arresting protestors.

172.     Defendant police officers John Does #11 and 12 lifted their bikes and pushed
them against Hernandez causing him to fall into and trip over other protesters next to
him.

173.     Defendant police officers John Does #11 and 12 did not give any dispersal orders
and caused Hernandez to be trapped in the crowd with no way to leave.

174.     Defendant Police Officer Pichardo grabbed Hernandez from the crowd without
cause, forcefully threw him to the ground and arrested him at about 8:00 p.m.

175.     Defendant police officers Pichardo and John Does #13 and #14 kept Hernandez
and 24 other protestors cuffed for over eight and a half hours in a prison van.

176.     Defendant Officer Lucero and Sgt. Haldeman were at the precinct and finally
uncuffed Hernandez at around 4:00 a.m. and forced him to sit in a jail cell with 20 other
individuals for another 5 hours, despite the ongoing pandemic.

177.     Hernandez asked for water many times and Defendant Officer Lucero stated that
he did not deserve it.

178.     Hernandez was finally released at 9:00 a.m. the following day.

179.     Upon release, Plaintiff Hernandez suffered from severe bruising, and emotional and
psychological trauma as a result of Defendants actions.

180.     As a result of Defendants' conduct, Plaintiff Hernandez demands judgment
against Defendants in a sum of money to be determined at trial including compensatory
and punitive damages along with costs and attorney's fees.

*Plaintiff Keith Clingman*

181.     On September 12, 2020 at approximately 8:15pm, at or near the 34th police
precinct located at 4295 Broadway, New York, NY 10033, Plaintiff was lawfully present

at the location and was exercising his Constitutional Rights to peacefully protest.

182.     Defendant Lieutenant Wells assaulted and used unlawful force upon Clingman, including grabbing his person and slamming him to the floor thereby causing his wrist and elbow to fracture.

183.     Defendant Police Officers John Does #15-20, were present, witnessed the assault and failed to intervene to stop the assault.

184.     Defendant Police Officer Erik Rodriguez and Defendant Police Officer Patrick Gross and several John Doe Police Officers unconstitutionally violated his First, Fourth, and Fourteenth Amendments, including but not limited to, rights to freedom of speech, freedom of assembly, and freedom from unlawful search and seizure.

185.      Defendant Lieutenant Wells and Defendant Police Officers John Does #15-20 refused to call for medical help for Clingman.

186.     Plaintiff Clingman struggled to get up with no one helping him.

187.     Upon getting up, Clingman approached Lieutenant Wells to ask for his badge number and to tell him that he had broken his arm.

188.     Defendant Police Officers John Does #15-20 heard Plaintiff's statements to Defendant Wells and witnessed the altercation but refused to help him.

189.     On Friday February 12, 2021, during a police accountability protest in Manhattan, Plaintiff Clingman was lawfully standing on the sidewalk with other protestors when officers began arresting an unhoused person. Approximately 80 SRG officers arrived on the scene in riot gear.

190.     As the unhoused person was being arrested, Clingman began filming the arrest when Defendant officers John Does #20 (who maybe PO Christopher Emmart; Shield

No.: 13299), John Doe #21 (who maybe PO Bryan Wilson; Shield No.: 10392),  and John

Does #22-25, from the Strategic Response Group, charged at Clingman and other

protestors, while on the sidewalk, without cause or justification.

191.      Defendant officer John Doe #26 (who maybe Police Officer Anthony Polanco )

placed Clingman under arrest and when Clingman asked for the basis of the arrest while

stating that he did not do anything, the officer replied, "I don't give a shit."

192.      While handcuffed, Defendant police officer John Doe #27 grabbed Plaintiff

Clingman while Defendant police officer John Does #28-32 jumped on top of him and

began beating him.

193.      Defendant police officer John Doe #28 dug his thumb in Clingman's left eye and

Defendant police officer John Doe #29 punched Clingman in the back of his head behind

his ear in an attempt to knock him unconscious.

194.      Defendant police officer John Doe #29 threw Clingman face first into a pile of ice

and Defendant police officer John Does #30-32 were on top of him. Defendant police

officer John Doe #31 put his knee and full weight on the back of Clingman's head,

pushing it further in the ice.

195.      Following his detention, Clingman was unconstitutionally arrested and issued a

desk appearance ticket by Defendant Police Officer Anthony Polanco.

196.      City of NY has instilled a policy, custom, and practice in which it encourages and

condones the brutal repression of protester's right in an effort to inhibit the lawful

expression of rights.

197.      NYPD encourages its officers to use unlawful violence and other unlawful

techniques against protesters and others exercising their rights.

198.     As a result of Defendants' conduct, **Plaintiff Clingman** demands judgment against Defendants in a sum of money to be determined at trial including compensatory and punitive damages along with costs and attorney's fees.

*Plaintiff Jonathan Peck*

199.     On the evening of January 18, 2021, Plaintiff Jonathan Peck was participating in a peaceful protest in honor of Martin Luther King Day.

200.     Upon exiting the Brooklyn Bridge and approaching an intersection near Centre Street and Chambers Street, the NYPD began pushing and herding protestors to City Hall Park.

201.     police officer began playing a disperse message from a long-range acoustic device (LRAD) directing protestors to get out of the street or be charged with disorderly conduct after a countdown.

202.     Defendant Captain Joseph B. Taylor ordered Defendant Police Officer Altamirano, among other John Doe police officers, to unconstitutionally arrest Peck.

203.     Once the countdown ended and without providing protestors ample time and means to disperse, Police Officers began arresting anyone that they could grab.

204.     A line of approximately twelve Police Officers stood in a line about 15 feet from Peck.  Defendant police officer John Does #34 and #35 pointed at Plaintiff and his friend, and charged at them.

205.     Defendant police officer John Doe #34 tackled Peck to the ground, and Defendant police officer John Does #35, 36, 37, and 38, Captain Taylor and  Luis E. Ortiz, pinned Peck to the ground.

206.     Plaintiff screamed to the Defendant Police officer John Does #36-38 and Defendant Police Officers Altamirano, Defendant Captain Taylor,  and  Luis E. Ortiz that

he could hardly breathe due to chest pain after being thrown to the ground.

207.     Defendant Police Officer Altamirano disregarded Peck's medical concerns and instead tightly zip tied Peck's hands and arrested him.

208.     Plaintiff Peck, along with dozens of other protestors, was transported to the precinct, where he was held for about four hours.

209.     Upon release, Peck went to the hospital for chest pains where he was informed that he had a severely inflamed chest wall that could take weeks or months to recover – with each case varying depending on levels of ongoing physical activity.

210.     As a result of Defendants' conduct, **Plaintiff Peck** demands judgment against Defendants in a sum of money to be determined at trial including compensatory and punitive damages along with costs and attorney's fees.

## FIRST CAUSE OF ACTION
Excessive Force/Unlawful Use of Force

211.     Plaintiffs repeat and reallege each and every Paragraph as if fully set forth herein.

212.     Defendant police officers used unreasonable, unlawful and excessive force against Plaintiffs, in violation of the Fourth and Fourteenth Amendments of the Constitution of the United States, 42 U.S.C. § 1983, NYS Constitution, New York State laws, and the common laws of New York.

213.     Defendants' actions were without any legal justification, and the force used upon Plaintiffs was excessive and unwarranted. Defendants' use of force against Plaintiffs was not justified and was applied wholesale against all protestors such as "kettling," shoving protestors with their bikes and pepper spraying the groups pursuant to or in violation of NYPD policies and practices.

214.     Each Plaintiff was also struck with batons, dragged and shoved to the ground. Plaintiff Gilzean had at least two of his dreadlocks ripped from his head by Defendant-Officers.

215.     Plaintiff Husary was beaten and shoved by Defendant-Officers to the point of breaking his tooth and continues to experience pain when trying to ride his bicycle.

216.     Plaintiff Clingman was beaten by Defendant Lieutenant Wells with such force that he broke Plaintiff's arm and was punched repeatedly about his head.

217.     As a direct and proximate result of each Defendants' acts and/or omissions, Plaintiffs suffered and continues to suffer significant severe physical and emotional injuries.

218.     As a direct and proximate result of the above unlawful conduct, Plaintiffs were caused to suffer personal injuries, violation of their rights under Federal, State, and common law, rights to be free from unlawful use of force, assault, and battery, emotional distress, anguish, anxiety, fear, humiliation, and loss of freedom.

219.     As a result of Defendants' impermissible conduct, Plaintiffs demands judgment against Defendants in a sum of money to be determined at trial.

### SECOND CAUSE OF ACTION
Assault and Battery

220.     Plaintiffs repeat and reallege each and every Paragraph as if fully set forth herein.

221.     Defendants approached Plaintiffs and struck them with baton and/or bikes causing them to suffer substantial injuries.

222.     Defendants approached Plaintiffs in an aggressive and hostile manner, causing them to fear for their safety and be apprehensive of the bodily harm inflicted upon them by the Defendants.

223.     Defendants also used unlawful force upon Plaintiffs, including striking them with incredible force that they suffered serious physical and psychological injuries.

224.     Each and every named Plaintiff was beaten by Defendants with batons. Defendants' use of force against Plaintiffs was not justified and was applied wholesale against all protestors such as "kettling," shoving protestors with their bikes and pepper spraying the groups pursuant to or in violation of NYPD policies and practices.

225.     Each Plaintiff was also struck with batons, dragged and shoved to the ground.

226.     As a result of Defendants' unlawful conduct, Plaintiffs demands judgment against Defendants in a sum of money to be determined at trial.

**THIRD CAUSE OF ACTION**
Violation of Right to Free Speech, Assembly, and Expression, and Retaliation

227.     Plaintiffs repeat and reallege each and every Paragraph as if fully set forth herein.

228.     Defendants-Officers were in uniform and acting under color of law when they engaged in the aforementioned conduct.

229.     The Defendants visited brutal violence upon Plaintiffs simply because they were exercising their rights under the United States and New York Constitutions of Expression, Speech and Assembly.

230.     The Defendants sought to inhibit their speech, assembly, and expression.

231.     As police officers, Defendants had the aim of inhibiting the exercising of Plaintiffs' rights, discouraging same, and inflicting physical harm upon them so that they would not continue to engage in conduct protected by the first amendment.

232.     Defendants retaliated against Plaintiffs for exercising their first amendment rights by failing to hold officers accountable who engaged in the acts or omission complained

herein, sanctioning continued behavior in violation of or consistent with NYPD policies and practices and also arresting Plaintiffs.

233. Defendants succeeded in their violation of Plaintiffs' rights to speech, assemble, and protest when they caused them significant injuries that inhibited their ability to exercise these rights.

234. As a result of Defendants' unlawful conduct, Plaintiffs demands judgment against Defendants in a sum of money to be determined at trial.

### FOURTH CAUSE OF ACTION
*Monell* Liability/Respondeat Superior/Failure to Supervise/Failure to Monitor/Negligent Hiring/Retention/Training/Failure to Protect

235. Plaintiffs repeat and reallege each and every Paragraph as if fully set forth herein.

236. The City of New York, via the NYPD, has effectively ratified the misconduct of the Defendant-Officers. The violation of Plaintiffs' Federal, State, and common law rights and resulting injuries were further directly, foreseeably, proximately, and substantially caused by conduct chargeable to the City of New York.

237. Defendant City of New York and the NYPD maintained a policy whereby, upon information and belief, they failed to meaningfully investigate IA and CCRB complaints, if they investigated them at all, thereby creating a policy and custom whereby officers felt that they could violate the rights of citizens with impunity and they would not be held accountable, particularly in the case of the Defendant-Officers.

238. Decision makers such as the Mayor and the Police commissioner condoned and encouraged the violation of Plaintiffs' rights as well as the use of excessive force as a routine policing tool. They also failed to take action despite repeatedly being placed on

notice of such wholesale violations and were aware that the unlawful conduct of the NYPD was being widely broadcast.

239. Defendants used unlawful and significant force upon Plaintiffs constituting improper, unlawful, and excessive use of force.

240. The City of New York and the NYPD are liable for the conduct of the Defendant Officers pursuant to respondeat superior as Defendant-Officers were acting within the scope of their employment, in furtherance of their job duties and on behalf of the City of New York when they engaged Plaintiff and committed the acts complained of herein.

241. In addition, the City of New York and the NYPD and the Defendant-Officers acted under color of law pursuant to an official policy or custom and practice of the NYPD whereby the use of unlawful and excessive force was permitted, tolerated, and condoned, and intentionally, knowingly, recklessly or with deliberate indifference failed to properly and adequately control, monitor, and discipline on a continuing basis their employees, agents and/or servants and/or otherwise failed to prevent the individual Defendants from unlawfully using excessive force upon Plaintiffs and violating their rights to protest and free speech.

242. The City of New York and NYPD failed to protect Plaintiffs and provide a safe opportunity for them to exercise their rights.

243. As a direct and proximate result of the above-described impermissible conduct, Plaintiffs were caused to suffer personal injuries, violation of their civil rights, as well as State and common law rights, emotional distress, anguish, anxiety, fear, humiliation and loss of freedom.

244.     As a result of Defendants' impermissible conduct, Plaintiffs demand judgment against Defendants in a sum of money to be determined at trial.

## FIFTH CAUSE OF ACTION
### Failure to Intervene

245.     Plaintiffs repeat and reallege each and every Paragraph as if fully set forth herein.

246.     Each of the Defendant-Officers engaged in the use of excessive force and assault of the Plaintiffs.

247.     While each Defendant-Officer was engaged in the use of excessive force and the violation of Plaintiffs' rights as alleged herein, those who were not using force against Plaintiffs failed to intervene to prevent the use of excessive force in violation of Plaintiffs' rights, despite an opportunity to do so.

248.     The Defendant-Officers watched as Plaintiffs were unlawfully subjected to excessive, unnecessary, and unlawful force.

249.     Each Defendant had an opportunity to intervene as the use of excessive, unnecessary and unlawful force was being deployed against Plaintiffs in front of them and within their immediate area. Each Defendant failed to instruct other officers not to use force or physically restrain the officers from using force.

250.     Rather than intervene to stop the use of excessive force and the violation of Plaintiffs' rights as alleged in this Complaint and as the law requires, the Defendant officers did nothing and, upon information and belief, then attempted to conceal the use of excessive force by making false statements about what occurred in seeking to justify the unlawful use of force.

251.    As a direct and proximate result of the above conduct, Plaintiffs suffered personal injuries, violation of their common law, State law and civil rights, emotional distress, anguish, anxiety, fear, humiliation and loss of freedom.

252.    As a result of Defendants' impermissible conduct, Plaintiffs demands judgment against Defendants in a sum of money to be determined at trial.

**SIXTH CAUSE OF ACTION**
Unlawful Arrest, False Arrest, Unlawful Search and Seizure

253.    Plaintiffs repeat and reallege each and every Paragraph as if fully set forth herein.

254.    Defendant-Officers engaged in an unlawful arrest and seizure of Plaintiffs.

255.    Each Defendant-Officer detained and arrested Plaintiffs without probable cause to do so.

256.    Each Defendant seized Plaintiffs without any probable cause or legal justification to do so.

257.    At no time did Plaintiffs consent to their detainment.

258.    No Defendant obtained a warrant for Plaintiffs' arrest, and nor did they have any legal justification to stop, seize, detain, arrest, or prosecute Plaintiffs.

259.    Plaintiffs did not consent to the unlawful arrest and seizure.

260.    As a direct and proximate result of the above impermissible conduct, Plaintiffs suffered personal injuries, violation of their common law, State law, and civil rights, emotional distress, anguish, anxiety, fear, humiliation and loss of freedom.

261.    As a result of Defendants' unlawful conduct, Plaintiffs demands judgment against Defendants in a sum of money to be determined at trial.

**WHEREFORE,** Plaintiffs demands that judgment be entered against the Defendants, jointly and severally, for:

(a) any and all damages sustained by the Plaintiffs arising from the foregoing wrongful and unlawful acts of the Defendants;

(b) punitive damages against the individual Defendant-Officers where permissible by law;

(c) interest, both pre-judgment and post-judgment;

(d) a declaration that Defendants' actions violated the rights of Plaintiffs;

(e) an Injunction prohibiting Defendants from violating the rights of protesters, and amending their policies to inhibit the actions that gave rise to the violation of rights as alleged herein;

(f) appointing a receiver to monitor and implement changes to protect the Constitutional rights of Plaintiffs and others similarly situated.

(g) attorney's fees and costs; and

(h) Grant such other and further relief as this Court may deem appropriate and equitable, including injunctive and declaratory relief as may be required in the interests of justice.

<u>JURY DEMAND</u>

Plaintiffs demands a trial by jury in this action for all issues triable by a jury.

Dated: May 28, 2023

Respectfully submitted,
The Aboushi Law Firm PLLC
<u>s/*Tahanie A. Aboushi*</u>
Tahanie A. Aboushi
Aymen A. Aboushi
1441 Broadway 5th Floor
New York, NY 10018
Telephone: (212) 391-8500
Tahanie@Aboushi.com
Aymen@Aboushi.com
*Attorneys for Plaintiffs*

45