UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT NEW YORK

| | |
|---|---|
| In Re: New York City Policing During Summer 2020 Demonstrations | 20 Civ. 8924 (CM)(GWG) |
| This filing is related to: ALL CASES | |

**CONSOLIDATED PLAINTIFFS' REPLY MEMORANDUM IN FURTHER SUPPORT OF THEIR MOTION FOR AN ORDER COMPELLING THE CITY TO IMPLEMENT <u>PARAGRAPH 89(h) OF THE STIPULATED ORDER</u>**

**TABLE OF CONTENTS**

Page

INTRODUCTION ................................................................................................................. 1

ARGUMENT ......................................................................................................................... 2

I.  THE CITY'S OPPOSITION FAILS TO OFFER A REASONABLE READING OF PARAGRAPH 89(h) THAT WOULD LIMIT IT TO CERTAIN CONTEXTS ........................... 2

    A.  Paragraph 89(h)'s Use of the Term "Incident Commander" Does Not Limit its Applicability to FAAs. ............................................................................................ 3

    B.  Paragraph 89(h)'s Reference to Approvals by DCPI Personnel Does Not Limit its Applicability to FAAs. ............................................................................................ 4

    C.  Paragraph 89(h)'s Use of the Term "Red Light Offense" Does Not Limit its Applicability to FAAs. ............................................................................................ 6

II.  THE CITY'S POLICY EXCUSES ARE NO GROUNDS TO AVOID IMPLEMENTING PARAGRAPH 89(h) ............................................................................................................ 6

    A.  The NYPD's Existing Policies Do Not Adequately Protect the First Amendment Rights of the Press and the Public, Nor Do They Justify Relieving the City of Its Obligations Under the Stipulated Order ................................................................. 8

    B.  The Paragraph 89(h) Policy Is Not a "Get Out of Jail Free Card" ..................... 9

CONCLUSION ..................................................................................................................... 10

4917-9547-0406v.5 0201731-000001

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Greenfield v. Philles Recs., Inc.*,
   98 N.Y.2d 562 (2002) ............................................................................................................7

*LPPAS Representative, LLC v. ATH Holding Co., LLC*,
   2022 WL 94610, at *5 (Del. Ch. Jan. 10, 2022) ....................................................................7

*Nebraska Press Ass'n v. Stuart*,
   427 U.S. 539 (1976) ...............................................................................................................9

*NY Mar. & Gen. Ins. Co. v Lafarge N. Am., Inc.*,
   599 F.3d 102 (2d Cir 2010) ....................................................................................................7

*Roberts v. Weight Watchers Int'l, Inc.*,
   712 F. App'x 57 (2d Cir. 2017) ..............................................................................................7

*United States v. Broad. Music, Inc.*,
   275 F.3d 168 (2d Cir. 2001) ..........................................................................................2, 5, 7

4917-9547-0406v.5 0201731-000001

**INTRODUCTION**

Plaintiffs in the Consolidated Protest Cases hereby submit this reply brief in further support of their motion for an order compelling the City of New York to fully implement Paragraph 89(h) of the parties' Stipulated Order (Dkt. 1195) (the "Motion" or "Mot")).[1]

In their Opposition to Plaintiffs' Motion (Dkt. 1199) ("Opposition" or "Opp."), the City attempts to build a plain language argument upon shifting sands of excuses. The City makes no effort to engage with the actual terms of Paragraph 89, which unambiguously require the City to implement each and every one of that paragraph's policies, including Paragraph 89(h), in "both FAA and non-FAA related circumstances." Nor does the City offer any legal basis for the Court to look past this clear language and instead read in a massive implied limitation on the Paragraph 89(h) policy (a limitation which could easily have been articulated had the parties intended it).

Instead, the City asks the Court to relieve it of its obligation to implement Paragraph 89(h) as written, on the basis that it would be impractical to do so in light of current NYPD policy and procedures, or unfair in light of the privileges it would grant the press. These are not grounds to avoid the obligations of the Stipulated Order. The City at best misunderstands, and at worst willfully misstates, the narrow "privilege" conveyed in paragraph 89(h), which only calls for NYPD officers to follow a procedure already within their existing discretion. And the City's "practicality" concerns amount to nothing more than a complaint that Paragraph 89(h) is inconsistent with *current* NYPD policy and procedure. Thus, the City's articulated "problem" contains the seed of its own solution: The City must change its policies and procedures to accommodate the policy set out in Paragraph 89(h). This kind of change to policy and procedure

---

[1] Unless otherwise indicated, defined terms in this memorandum refer to terms defined in the Motion.

1

is precisely what the Stipulated Order contemplates, what the City agreed to, and what it is now obligated to implement.

## ARGUMENT

### I. THE CITY'S OPPOSITION FAILS TO OFFER A REASONABLE READING OF PARAGRAPH 89(h) THAT WOULD LIMIT IT TO CERTAIN CONTEXTS

The parties agree that general principles of contract interpretation apply to the Stipulated Order, *see* Opp. at 5, yet the City's Opposition takes positions in direct conflict with those principles. First, the City argues that the "plain language" of Paragraph 89(h) requires it to be limited to "large-scale events where NYPD engages in major deployment and journalists on scene are entitled to a strong presumption that they are engaged in constitutionally protected newsgathering." *Id.* at 6. But this argument is missing one essential piece: language in the Stipulated Order supporting the City's interpretation. Indeed, the terms the City invokes to articulate how Paragraph 89(h) should be limited—to "major deployments" and "large-scale events," *id.*—do not appear anywhere in the Stipulated Order. Instead, the City asks the Court to infer these limitations by looking to extrinsic evidence regarding when Incident Commanders are assigned or when DCPI personnel are typically deployed to the scene. This puts the cart before the horse. "When the language of a consent decree is unambiguous, 'the scope of a consent decree must be discerned within its four corners.'" *United States v. Broad. Music, Inc.*, 275 F.3d 168, 175 (2d Cir. 2001) (citation omitted). Here, as set out in the Motion, Paragraph 89(h) unambiguously applies in both FAA and non-FAA contexts, and must be implemented accordingly. The City's extrinsic evidence is both irrelevant and inadmissible under these circumstances. Moreover, that evidence does not even support the City's unreasonable reading of Paragraph 89(h).

### A.   Paragraph 89(h)'s Use of the Term "Incident Commander" Does Not Limit its Applicability to FAAs.

The City first argues that Paragraph 89(h)'s reference to an Incident Commander—"Where a member of the press is arrested for any Red Light offense(s) . . . process for that arrest shall be approved by the Incident Commander and/or DCPI personnel at the time of the arrest"—renders the policy it sets out "nonsensical and impossible to implement" outside the context of FAAs since Incident Commanders are only designated at "large deployments." Opp. at 7. Initially, the City's position asks the Court to ignore the obvious: The approval process set forth in Paragraph 89(h) is not limited to Incident Commanders. Instead, an Incident Commander *or* DCPI personnel may give the necessary approval of the arrest, accounting for both circumstances where an Incident Commander is present and circumstances where one is not.[2] Nor can the City justify its narrowing by reference to the rest of the Stipulated Order. While it argues that the term "Incident Commander" is used elsewhere in the Stipulated Order to refer to "the Incident Commander at an FAA," this is because the cited other uses of the term are in sections of the Stipulated Order that explicitly concern FAAs. Specifically, each paragraph cited by the City falls under a section of the Stipulated Order titled "NYPD POLICIES AND PRACTICES GOVERNING THE POLICING OF FAAs." *See* S.O. at 5; Opp. at 7. By contrast, Paragraph 89(h) falls under the section titled "TREATMENT OF MEMBERS OF THE PRESS," which covers subject matter not limited to the context of FAAs. S.O. at 19. In short, nothing in the four corners of the Stipulated Order supports the narrow reading the City proposes.

---

[2] Moreover, as set out in the Motion, the City's attempt to recast "Incident Commander" as a designation relevant only to "large deployments" is belied by its own policy materials. Other references to "Incident Commander" in the NYPD's Patrol Guide indicate that this term simply refers to the highest ranking member of service present at the scene of any incident. *See* Mot. at 12-13.

3

### B. Paragraph 89(h)'s Reference to Approvals by DCPI Personnel Does Not Limit its Applicability to FAAs.

Next, the City argues that the option for DCPI to approve process for any arrest of a government-credentialed journalist at the time of arrest "limits [the] practical applicability" of Paragraph 89(h) "to large-scale deployments where DCPI would reasonably be expected to have personnel on scene." Opp. at 8. This argument, once again, asks the Court to ignore the plain language of the Stipulated Order and impose a narrowed meaning to fit the City's preferred implementation, without legal basis. By its terms, Paragraph 89(h) does not require DCPI personnel to be on scene to issue approvals, meaning they can be conveyed by telephone or other remote means. Thus, it is irrelevant whether DCPI "would be reasonably expected to have personnel on scene" at any given police interaction with a credentialed member of the press, and certainly no basis to read Paragraph 89(h)'s policy as limited to FAAs.

The City next argues that even though DCPI personnel are staffed 24 hours a day, seven days a week, and are already notified by members of service of incidents involving members of the press, "that notification is not expected to occur in real-time." Opp. at 8. Nor, the City argues, are DCPI personnel "trained [or] expected, to participate in arrest decisions by members of service in the field." Opp. at 9.[3] Yet, the NYPD's own Patrol Guide provides that "[t]he Office of the Deputy Commissioner, Public Information, is available 24 hours a day, 7 days a week for *consultation and/or response to incidents involving the press*," and that "[m]embers of the service are required to *immediately notify* the Deputy Commissioner, Public Information of

---

[3] The City also complains in a footnote of "[t]he difficulty in validating a claim of press membership." Opp. at 9 n.7. But these concerns are addressed directly in Paragraph 89(h) itself, which includes a detailed set of instructions on how to verify the validity of a government-issued press credential. S.O. ¶ 89(h). The fact that the City itself negotiated and agreed to this procedure disposes of any argument that it would be unreasonable to comply with.

4

*any incident* involving the press." P.G. 212-49 (emphasis added); *see also* Mot. at 12. Thus, the Patrol Guide itself indicates DCPI is already staffed and prepared for immediate consultation regarding incidents involving the press, belying the City's claims that DCPI cannot practically be expected to fulfill the responsibilities called for under Paragraph 89(h).

But the Court need not decide how DCPI *currently* operates to decide Plaintiffs' Motion, because the Stipulated Order, by its express terms, requires *changes* to the City's policies and procedures. Indeed, it provides a lengthy, phased implementation period precisely to allow the City sufficient time to revise its policies and train officers. To the extent NYPD personnel are not currently trained on the policies and procedures set out in the Stipulated Order,[4] the solution is not to relieve the City of its obligation to implement them (even if the law allowed such a reprieve, which it does not). The solution is *to train NYPD personnel on these new policies and procedures*, as the Stipulated Order requires.

The City also submits extrinsic evidence in the form of a Declaration by DCPI Inspector Aaron Edwards (Dkt. No. 1200) ("Edwards Decl.") to support its claims about how DCPI typically functions. This evidence is irrelevant to the interpretation of the Stipulated Order's unambiguous terms. *Broad. Music, Inc.*, 275 F.3d at 175. Moreover, Inspector Edwards' Declaration undermines, rather than supports, the City's position. For example, the City argues that Paragraph 89(h) should be read as unambiguously limited to FAAs in part because "DCPI would reasonably be expected to have personnel on scene" at FAAs. Opp. at 8. Yet Inspector

---

[4] Indeed, as Plaintiffs flagged in their Motion, the City has not yet begun training on *any* aspect of the Stipulated Order. *See* Mot. at 8 n.6; Everdell Decl. ¶ 14. The City has taken the position that its training materials cannot be finalized until the resolution of this Motion concerning the scope of a subsection of a single paragraph. While Plaintiffs disagree with this position, it leaves no question that the City has ample opportunity in Phase II to train its officers as needed on the Paragraph 89(h) policy.

5

Edwards admits that "[m]embers of DCPI are not physically present at every protest." Edwards Decl. ¶ 4. Accordingly, by its own evidence, limiting Paragraph 89(h) to the context of FAAs would not even solve the City's purported concerns.

### C. Paragraph 89(h)'s Use of the Term "Red Light Offense" Does Not Limit its Applicability to FAAs.

Finally, the City's Opposition addresses Paragraph 89(h)'s use of the term "Red Light offense(s)," claiming that the "scope" of this term "only warrants special treatment at FAAs and other major deployments." Opp. at 9. As set out in Plaintiffs' Motion, the term "Red Light offense" itself is not defined to be limited to FAAs or other major deployments, *see* S.O. ¶ 29, and nothing else in Paragraph 89(h) supports the reading that it should be limited to FAAs by virtue of incorporating that term. Mot. at 10-11. The City makes no real effort to dispute these points, but instead argues that the entire "Red Light Green Light" policy articulated elsewhere in the Stipulated Order—which requires approval of Red Light arrests by a Captain or above—cannot be applied outside the context of FAAs and "other large-scale deployments." Opp. at 10. This is another straw man: Plaintiffs do not contend that the "Red Light Green Light" policy must be applied outside of FAAs, nor does Paragraph 89(h) purport to incorporate any portion of that policy aside from the definition of "Red Light offense." Instead, Paragraph 89(h) simply borrows a defined term from earlier in the Stipulated Order to avoid having to redefine it. It does not matter whether other aspects of the Red Light Green Light policy can be implemented outside FAAs, since no one has asked for them to be. Once again, the City's arguments gain it no traction in its effort to relieve itself of its obligation to implement Paragraph 89(h) as plainly written.

### II. THE CITY'S POLICY EXCUSES ARE NO GROUNDS TO AVOID IMPLEMENTING PARAGRAPH 89(h)

The City's Opposition next offers two policy arguments: It argues the Paragraph 89(h)

6

policy is not necessary to address the policing misconduct against members of the press alleged by the *Gray* Plaintiffs (Opp. at 10-11), and that the policy is unreasonable because it conveys "special privileges on everyone claiming to be a member of the press" (Opp. at 11-12). These arguments are irrelevant to the Court's task on this Motion, which is to interpret the plain meaning of the Stipulated Order and hold the City to its terms. *See Broad. Music, Inc.,* 275 F.3d at 175. And where, as here, "the agreement on its face is reasonably susceptible of only one meaning, a court is not free to alter the contract to reflect its personal notions of fairness and equity." *Greenfield v. Philles Recs., Inc.*, 98 N.Y.2d 562, 569–70 (2002).

Moreover, even if the Court found Paragraph 89(h) ambiguous (though it is not) and decided to entertain extrinsic evidence, the City's policy arguments would gain it no advantage. In the event of ambiguous language, Courts look first to extrinsic evidence that can "yield a conclusive answer as to the parties' intent." *NY Mar. & Gen. Ins. Co. v Lafarge N. Am., Inc.*, 599 F.3d 102, 118, n 7 (2d Cir 2010) (quotation marks omitted). Here, Plaintiffs offered such conclusive evidence in the form of parol evidence of the parties' negotiations. *See* Mot. at 15-16; Exs. I, J. *See also LPPAS Representative, LLC v. ATH Holding Co.*, LLC, 2022 WL 94610, at *5 (Del. Ch. Jan. 10, 2022) ("contemporaneous drafting history is the most reliable extrinsic evidence of the parties' intent"). This evidence confirms that Paragraph 89(h) was intended to apply in all contexts, and the Opposition makes no attempt to dispute that conclusion. The City cannot ask the Court to skip over this clear evidence of intent and instead evaluate the equities to "make a new contract for the parties under the guise of interpreting the writing." *Roberts v. Weight Watchers Int'l, Inc.*, 712 F. App'x 57, 60 (2d Cir. 2017).

Yet even if the Court *did* entertain the City's policy arguments, they fail to hold up to the slightest scrutiny:

7

### A. The NYPD's Existing Policies Do Not Adequately Protect the First Amendment Rights of the Press and the Public, Nor Do They Justify Relieving the City of Its Obligations Under the Stipulated Order

The City first argues that the *Gray* Plaintiffs' allegations regarding the wrongful arrest of Amr Alfiky in February 2020, while he was photographing the arrest of a mentally disturbed man in a non-FAA context, do not "justify or warrant" the NYPD implementing a press-protective policy applicable outside the context of FAAs. Opp. at 10. In the City's view, "the alleged conduct [in the *Gray* TAC] was and is already contrary to law and NYPD policy." *Id*. Plaintiffs agree. Nevertheless, as alleged in the *Gray* TAC, Mr. Alfiky was arrested while recording police conduct on the pretext of failing to comply with an arbitrary and nonsensical order, his self-identification as a member of the press and his offer to present his credentials were ignored, and he was taken into custody for hours. *Gray* TAC ¶¶ 86-96. This not only constituted retaliation against Mr. Alfiky for engaging in newsgathering, it also prevented him from engaging in any further newsgathering. And yet, to Plaintiffs' knowledge, the officer involved was never disciplined. *Id*. ¶ 123. In fact, to Plaintiffs' knowledge, the *only* remedial taken by the City in the wake of this incident was settling the *Gray* case and entering into the Stipulated Order. The City cannot now be allowed to deprive Mr. Alfiky and the other press Plaintiffs of the benefit of their bargain.

Moreover, the Alfiky incident does not stand alone. This and other alleged incidents in non-FAA circumstances, *see Gray* TAC ¶ 107, show that the NYPD's existing policies are inadequate to protect members of the press from being taken off the streets under the pretext of low-level non-violent offenses, thereby depriving the public the benefit of their newsgathering.[5]

---

[5] Indeed, arresting and detaining journalists for hours on summons-on-site eligible charges (which are almost always later dismissed or declined to be prosecuted) creates a *de facto* prior restraint by preventing journalists from continuing to cover newsworthy events and from timely disseminating their reporting and documentation. As the Supreme Court has held, "prior

8

Paragraph 89(h), as written, ensures that NYPD officers do not misuse their authority in a way that limits the public's right to know.

### B. The Paragraph 89(h) Policy Is Not a "Get Out of Jail Free Card"

The City also grossly mischaracterizes the Paragraph 89(h) policy in claiming, wrongly, that it would "empower every self-identified 'journalist' to consider themselves immune to arrest for the low-level offenses defined as 'Red Light offenses,'" and therefore "practically eliminate the ability of officers to make routine arrests." Opp. at 13, 12.

Initially, while the City repeatedly raises the specter of "self-identified" or "self-described journalists" taking advantage of the policy, Opp. at 12, 13, Paragraph 89(h) by its plain terms only applies to *credentialed* journalists, specifically those with "MOME press credential[s]" or other "government-issued press credential[s]." S.O. ¶ 89(h). The policy also provides that "[i]n the event the member of the press is presenting a government-issued press credential from another jurisdiction or government agency, this shall be verified, to the extent possible, at the time of encounter," and includes specific instructions on how to verify a credential. *Id*. These detailed procedures directly address the City's purported concern about individuals "self-identifying" as journalists to take advantage of the policy.

Next, contrary to the City's characterization throughout their Opposition, the Paragraph 89(h) policy does not render journalists "immune" from arrest. *See* Opp. at 13. Instead, it triggers two actions by the NYPD when credentialed members of the press are arrested for low-level offenses: First, it requires that a member of service seek approval before issuing process to ensure that a commanding officer or otherwise press-familiar officer at DCPI has a chance to

---

restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976).

9

weigh in on the propriety of the charge.  Second, the Paragraph 89(h) policy creates a presumption that when the charged offense is *already eligible* for a summons-on-site, the journalist will be issued such a summons, and will not be removed from the scene.  In other words, the journalist is issued process through a means *already* within the arresting officer's discretion.  These are neither unreasonable "special privileges" nor a "get out of jail free card."  Rather, they are much-needed protections, ensuring that journalists are not taken off the street where they could be issued a summons at the point of the encounter under existing law and policy.  Nor is this presumption akin to an arbitrary status-based privilege, like a city employee asking for special favors.  *See* Opp. at 13.  Instead, it serves the critical and constitutionally informed purpose of ensuring that the professionals who act as the eyes and ears of the public are allowed to gather and disseminate information to the maximum extent allowed by the law.  The City must implement this policy as unambiguously written, stipulated-to, and so-ordered.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully ask this Court to enter an order requiring the City to revise its policy and training materials—including, at minimum, (1) "Media Press Powerpoint" (Ex. C); (2) "NYPDU Media_Press" training (Ex. D); (3) "Final Draft Day 1 Module 8" of Policing First Amendment Activities training (Ex. E); and (4) Patrol Guide 212-49 (*Id.* Ex. F)— to clearly articulate that the Section 89(h) policy applies both in and outside the context of FAAs, and award Plaintiffs their reasonable costs and fees incurred in making this motion, pursuant to Paragraph 138 of the Stipulated Order.

Dated: New York, New York
       May 27, 2025

Respectfully submitted,

*/s/ Robert D. Balin*
Robert D. Balin
Abigail Everdell
Nimra H. Azmi
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, New York 10020
Phone: (212) 489-8230
Fax: (212) 489-8340
robbalin@dwt.com
abigaileverdell@dwt.com
kathleenfarley@dwt.com

Wylie Stecklow
WYLIE STECKLOW PLLC
Carnegie Hill Tower
152 W. 57th Street, 8th Floor
NY NY10019
(t) 212 566 8000
ecf@WylieLAW.com

Mickey H. Osterreicher
General Counsel
NATIONAL PRESS PHOTOGRAPHERS ASSOCIATION
70 Niagara Street
Buffalo, New York 14202
Tel: (716) 983-7800
Fax: (716) 608-1509
lawyer@nppa.org

Alicia Calzada (*pro hac vice*)
ALICIA WAGNER CALZADA, PLLC
Deputy General Counsel
National Press Photographers Association
926 Chulie Drive, suite 16
San Antonio, TX 78216
210-825-1449
Alicia@calzadalegal.com

*Co-Counsel for Plaintiffs in Gray v. City of New York et al*

*/s/ Molly K. Biklen*

11

4917-9547-0406v.5 0201731-000001


Dated: New York, New York
       May 27, 2025

Respectfully submitted,

*/s/ Robert D. Balin*
Robert D. Balin
Abigail Everdell
Nimra H. Azmi
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, New York 10020
Phone: (212) 489-8230
Fax: (212) 489-8340
robbalin@dwt.com
abigaileverdell@dwt.com
kathleenfarley@dwt.com

Wylie Stecklow
WYLIE STECKLOW PLLC
Carnegie Hill Tower
152 W. 57th Street, 8th Floor
NY NY10019
(t) 212 566 8000
ecf@WylieLAW.com

Mickey H. Osterreicher
General Counsel
NATIONAL PRESS PHOTOGRAPHERS ASSOCIATION
70 Niagara Street
Buffalo, New York 14202
Tel: (716) 983-7800
Fax: (716) 608-1509
lawyer@nppa.org

Alicia Calzada (*pro hac vice*)
ALICIA WAGNER CALZADA, PLLC
Deputy General Counsel
National Press Photographers Association
926 Chulie Drive, suite 16
San Antonio, TX 78216
210-825-1449
Alicia@calzadalegal.com

*Co-Counsel for Plaintiffs in Gray v. City of New York et al*

*/s/ Molly K. Biklen*

Molly K. Biklen
Jessica Perry
Daniel R. Lambright
Robert Hodgson
Veronica Salama
NEW YORK CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 19th Floor
New York, N.Y. 10004
Tel: (212) 607-3300
mbiklen@nyclu.org

Jennvine Wong
Rigodis Appling
THE LEGAL AID SOCIETY
49 Thomas Street,
10th Floor
New York, NY 10013
(646) 577-3398

Corey Stoughton
SELENDY GAY PLLC
1290 Avenue of the
Americas
New York, NY 10104
(212) 390-9000

*Counsel for Plaintiffs in Payne v. De Blasio, 20 Civ. 8924*

LETITIA JAMES
*Attorney General of the State of New York*

By: /s/ _Travis England_____
Sandra Park, Chief, *Civil Rights Bureau*
Travis England, *Deputy Chief, Civil Rights Bureau*
Lillian Marquez, *Assistant Attorney General*
Office of the New York State Attorney General
28 Liberty Street, 20th Floor
New York, NY 10005
(212) 416-6233
Travis.England@ag.ny.gov

12

The Aboushi Law Firm PLLC

*/s/ Tahanie A. Aboushi*
Tahanie A. Aboushi, Esq.
Aymen A. Aboushi, Esq.
The Aboushi Law Firm
1441 Broadway, 5th Floor
New York, NY 10018
Tel: (212) 391-8500
Tahanie@Aboushi.com
Aymen@Aboushi.com

COHEN&GREEN P.L.L.C.

By: *Elena L. Cohen*
Elena L. Cohen
J. Remy Green
Jessica Massimi

1639 Centre Street, Suite 216
Ridgewood (Queens), NY 11385
Tel: (929) 888-9480
Fax: (929) 888-9457
elena@femmelaw.com
remy@femmelaw.com
jessica@femmelaw.com

GIDEON ORION OLIVER

*/s/ Gideon Orion Oliver*
277 Broadway, Suite 1501
New York, NY  10007
t: 718-783-3682
f: 646-349-2914
Gideon@GideonLaw.com

*Counsel for Plaintiffs in Rolon, et al v. City of New York, et al, No. 21-cv-2548*

13