UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

In re New York City Policing during 2020
Demonstrations

20 Civ. 8924 (CM)(GWG)

------------------------------------------------------------x

THIS MATTER RELATES TO

------------------------------------------------------------x

GRAY, et al.,

       Plaintiffs,

    -against-

20 Civ. 6610 (CM)(CWC)

CITY OF NEW YORK, et al.,

       Defendants.

------------------------------------------------------------x

### DECISION AND ORDER DISPOSING OF THE GRAY PLAINTIFFS' MOTION TO COMPEL THE CITY TO IMPLEMENT PARAGRAPH 89(H) OF THE STIPULATED ORDER OF SETTLEMENT[1]

McMahon, J.:

The court retains jurisdiction to enforce the terms of the settlement that brought an end to the multiple lawsuits arising out of the alleged police misconduct that occurred during the demonstrations that rocked New York City during the summer of 2020. Stipulated Order of Settlement (Dkt. Nos. 1167; 1166-1). Plaintiffs have moved for an order compelling the City to implement one specific paragraph of that settlement – Paragraph 89(h). The City opposes the

---

[1] While the motion was filed on behalf of all consolidated plaintiffs, in fact it applies to a specific provision of the settlement that relates SOLELY to members of the credentialed press, who were the plaintiffs in the *Gray* case. I appreciate that the case brought by the Attorney General included press-related allegations as well. (Dkt. No. 51 ¶¶ 399-430), but the principal case brought to vindicate the rights of members of the press to engage in newsgathering activities free from police hindrance was *Gray*, which was brought by members of the press themselves – not by a public official acting *in parens patriae*. Significantly, the motion was brought and filed under the *Gray* docket number – not the consolidated case docket number.

motion and counters that it has already done everything required of it by the text of that particular paragraph of the settlement agreement.

I conclude that Plaintiffs have the better of the argument, and I grant the motion.

### 1. The Underlying Agreement: The Stipulated Order

In *Gray v. City of New York* (20 Civ. 6610), members of the press sued the City of New York and various other defendants, alleging that they had been unlawfully and unconstitutionally assaulted and/or arrested while engaged in constitutionally protected newsgathering activities. The Gray plaintiffs pleaded facts in their complaint that related to alleged police interference with constitutionally protected newsgathering dating back some months prior to the Summer 2020 "Black Lives Matter" protests that were the basis for the other lawsuits (including the Attorney General's *in parens patriae* lawsuit, *People v. City of New York*, 21 Civ. 322) that were consolidated before this court. There were also allegations in *Gray* relating to the BLM protests that took place principally during the Summer of 2020.

The consolidated matters were settled on April 17, 2024 with the filing and so ordering of what has become known as the Stipulated Order. I here briefly summarize the terms of that document.

Section I of the Stipulated Order defines various terms. One of those terms is "First Amendment Activity" ("FAA"). And FAA is in turn defined to mean "any protest or demonstration at which individuals are expressing their rights under the First Amendment to the United States Constitution and Article I, Section 8 of the New York State Constitution. A protest and a counterprotest in the same general location shall be considered a single FAA for purposes of this Agreement." (Section I.6).

Section II of the Stipulated Order sets out "General Principles" governing the policing of FAAs. Essentially, it stipulates that the police will not arrest or retaliate against any person who is exercising his/her First Amendment rights in the context of FAAs.

Section III of the Stipulated Order sets out "NYPD Policies and Practices Governing the Policing of FAAs." These include the so-called "Red Light/Green Light" policy, which identifies those offenses (Red Light Offenses) for which an arrest during an FAA cannot be made without the approval of an officer at the rank of Captain or above. *See* Stipulated Order ¶ 29. These offenses, all of them low level crimes, include: riot, incitement to riot, non-violent obstruction of governmental administration, violation of emergency orders, disorderly conduct, trespass, criminal mischief in the third or fourth degree, violation of New York State Vehicle and Traffic Law (VTL) Sec. 1156(a), and unlawful assembly (New York State Penal Law 240.10). All other offenses are deemed "Green Light Offenses," for which an arresting officer need not obtain approval of a senior officer before effectuating such an arrest – arrests, for example, for assault, burglary, robbery, or arson. Section III also adopts the so-called "Tiered" approach to policing FAAs, which was the subject of litigation involving certain intervenor police unions. Everything in Section III relates explicitly to FAAs – which is to say, to mass protests and demonstrations, as defined in Section I.6 – and to no other situation.

Section IV of the Stipulated Order relates to the Training of NYPD officers with respect to the policies set forth in Section III. As such it too applies specifically and solely to FAAs.

Section V of the Stipulated Order is entitled "Discipline for Misconduct During Demonstrations," and specifies how NYPD officers will be disciplined if they deviate from the policies set forth in Section III of the Order. Again, Section III deals only with policing during FAAs.

3

Section VI of the Stipulated Order addresses "Treatment of Members of the Press." This section begins differently from the preceding sections. It says, "NYPD shall institute policies, protocols, and updates to the Patrol Guide and Administrative Guide relating to the NYPD's interactions with members of the press *applicable to both FAA and non-FAA related circumstances*, which shall include the following:" (Stipulated Order ¶ 89) (emphasis added). There follow nine separate sub-paragraphs, outlining exactly what those policies and protocols are to be. Significantly, Section VI is the only section of the Stipulated Order that by its express terms applies to "both FAA and non-FAA related circumstances." None of the nine sub-paragraphs includes by its terms any statement that it was intended to be applicable only during FAAs – which is to say, no sub-paragraph expressly carves out an exception to the general rule of Section VI.

Section VII of the Stipulated Order deals with police treatment of Legal Observers, and has nothing to do with the instant motion.

Section VIII, entitled "Documentation," relates to the documentation of actions taken by the NYPD during an FAA.

Section IX, entitled "Oversight," sets out a phased schedule and procedures for implementing the substantive sections of the Stipulated Order.

I cannot locate either a Section X or a Section XI in the text of the Stipulated Order.

Section XII is entitled "Attorneys Fees and Costs."

Section XIII is entitled "Other Provisions." There aren't any.

**2. The Provision of the Stipulated Order at Issue: Paragraph 89(h)**

Paragraph 89(h) is one of the nine specific provisions in Section VI that relate to police-press interaction. It provides as follows:

> Where a member of the press is arrested for any Red Light offense(s) and presents a MOME press credential or an official government-issued press credential from another

jurisdiction or government agency, process for that arrest shall be approved by the Incident Commander and/or DCPI[2] personnel at the time of the arrest. If such member of the press is arrested for a C-summons-eligible Red Light offense, the presumption shall be that the arrested member of the press will be issued process at the point of encounter. Such arrested member of the press may be removed to an arrest processing facility or otherwise transported to another location only in those instances where the Incident Commander determines that issuing process at the point of encounter would create a health and/or safety risk to officers or any other individual. In the event the member of the press is presenting a government-issued press credential from another jurisdiction or government agency, this shall be verified, to the extent possible, at the time of encounter. In a circumstance where the validity of the press credential is unable to be verified on scene, officers shall consider the following as indicia of the credential [sic] being valid . . .

Paragraph 89(h) incorporates the term "red light offenses," which is defined in Section III, Paragraph 29 of the Stipulated Order (a paragraph that deals solely with FAAs).

Paragraph 89(h) also refers to an "Incident Commander," which is not a defined term in the Stipulated Order, but which appears elsewhere in the Stipulated Order with specific reference to an Incident Commander for an FAA. (*See, e.g.*, Stipulated Order ¶¶ 23; 25; 26).

The general gist of this sub-paragraph is that members of the press who present valid government issued press credentials while being cited for a low-level offense are not to be taken to One Police Plaza or a station house for arrest processing unless the arresting officer obtains approval from higher ups.

### 3. The Parties' Positions

The Plaintiffs take the position that Section VI obligates the City to promulgate a policy relating to the citation and/or arrest of credentialed members of a press in all circumstances – whether or not the citation or arrest takes place in the context of an FAA. They argue that Paragraph 89(h) requires a police officer who is in the process of arresting a credentialed member of the press for any of the Red Light (i.e., specified low level) offenses (using a term defined in Paragraph 29 of the Stipulated Order) to obtain approval from either (1) an Incident Commander, or (2)

---

[2] "DCPI" refers to the City's Office of the Deputy Commissioner for Press Interaction

5

personnel from the Office of the Deputy Commissioner for Press Interaction before doing anything other than issuing a summons.[3] Plaintiffs assert that, because Section VI and Paragraph 89 therein apply to both FAA-related and non FAA-related conduct, the provisions of Paragraph 89(h) must be incorporated into non FAA-related policies, procedures and training resources. And they insist that the draft policy revisions and training manuals shared by the City with counsel for the Plaintiffs fail to comply with the Stipulated Order because they apply only to arrests that take place during FAAs – not to arrests that take place outside of that context.

The City takes the position that, despite the clear and unequivocal language of Paragraph 89 – which states in no uncertain terms that its nine substantive provisions apply to both FAA and non FAA activity by members of the press – Paragraph 89(h) was intended to apply only during FAAs, and not otherwise. It insists that to read the paragraph otherwise would both render it nonsensical and give members of the press a "free pass" to avoid arrest in situations where they are not gathering news, simply by flashing their press credentials. The City grounds its argument in the following:

    (i)    Paragraph 89(h) refers to approval of an arrest by an Incident Commander. As noted above, the Stipulated Order does not define the term "Incident Commander," but the City nonetheless insists that it is a term of art as used in the Stipulated Order, because all other references to Incident Commanders in the Stipulated Order relate to FAAs. In non-FAA situations, the City argues, there would not be an Incident Commander, so the provision requiring approval of a non-FAA arrest by an Incident Commander makes no sense.

---

[3] No higher approval is needed for the issuance of a summons, or for arrest for any more serious crime – i.e., one that would qualify as a "Green Light" offense. So if, for example, someone were being arrested for smashing windows, or for hitting someone, s/he could not stall the process or argue for remaining on site by flashing a government-issued press credential.

6

(ii)     Paragraph 89(h) also permits the arrest of a credentialed member of the press to be approved by DCPI. But according to a declaration sworn out by NYPD Inspector Aaron Edwards, DCPI personnel do not approve arrests and are not trained or equipped to do so. The Office of DCPI is "responsible for communication, reputational management, and facilitating citywide news coverage for members of the press." It is notified about press incidents (including arrests of credentialed members of the press) but not necessarily in real time and solely for the purpose of facilitating "reputational management" and news coverage. DCPI personnel are therefore not equipped to opine on whether an officer on the ground is within his rights to arrest someone who presents press credentials.

(iii)     Finally, the City contends that the use of the phrase "Red Light Offenses" specifically references Section III of the Stipulated Order, which applies by its express terms solely to FAAs. This, the City insists, indicates that Paragraph 89(h) – the only place in Section VI/Paragraph 89 where the term "red light offenses" is used – was similarly intended to apply only to FAAs, the disclaimer at the beginning of Paragraph 89 notwithstanding.

Plaintiffs respond to the City's argument as follows:

(i)     While the term "Incident Commander" is not defined in the Stipulated Order, the NYPD Police Patrol Guide provides for the designation of an Incident Commander in situations that do not fall within the definition of FAAs – a fact the City concedes. While it is true that the situations described in the Patrol Guide are all situations in which one would expect a large number of NYPD officers to be deployed (and

which, while not demonstrations, are undoubtedly sufficiently serious to be intrinsically newsworthy), those situations do not fall within the Stipulated Order's definition of FAAs. There is, therefore, no basis for concluding that the mention of an Incident Commander in Paragraph 89(h) limits the reach of that paragraph to FAAs.

(ii) If an arrest takes place where no one has been designated as Incident Commander, Paragraph 89(h) expressly provides an alternative route for obtaining approval – from DCPI, whose personnel are available by telephone "24 hours a day, seven days a week, to assist members of the media with stories, breaking news, or other inquiries they may have." Public Information, New York City Police Department, https://www.nyc.gov/site/nypd/bureaus/administrative/public-information.page (last accessed June 17, 2025). While DCPI personnel have traditionally only responded to events that "generate a large media presence, such as major crime scenes, parades, demonstrations, and disasters," (*id*.), Section 212-49 of the Patrol Guide provides that DCPI must be notified whenever there is any sort of incident involving a member of the press. That requirement is not limited to FAAs, or even to incidents that generate a large media presence. NYPD Patrol Guide 212-49, https://www.nyc.gov/site/nypd/about/about-nypd/manual.page, (last accessed June 17, 2025). This alternative method of obtaining approval is, therefore, available to obtain arrest approval when there is no Incident Commander who can be consulted.

(iii) The City signed an agreement that plainly provided for arrest approval by DCPI officers; that is what Paragraph 89(h) says. This means that traditional limitations on the role of DCPI, whatever those might be, are irrelevant. If DCPI personnel are

not presently trained to give such approval – because that is not an obligation they have traditionally shouldered – they need to be trained so they can carry out the task that is inarguably assigned to them in Paragraph 89(h). That training should be pursuant to the very procedures that Plaintiffs contend the City is refusing to implement. Moreover, the Edwards declaration about DCPI's tradition role is not available to vary the terms of an unambiguous agreement.

### 4. The Answer Is…………..

Plaintiffs win.

The Stipulated Order is a court-endorsed contract among the parties to the consolidated lawsuits. Like all consent decrees, its meaning is construed using the same precepts that govern the construction of all contracts. *See Doe v. Pataki*, 481 F. 3d 69, 75 (2d Cir. 2007); *Broad. Music, Inc. v. DMX Inc.*, 683 F. 3d 32, 43 (2d Cir. 2012). "When the language of a consent decree is unambiguous, deference is paid to the plain meaning of the decree's language," so as to give effect to the intent of the parties as revealed by the words they used – and the words they did not use. *Broad. Music*, 683 F. 3d at 43. Only if a contract term is ambiguous should a court consider anything other than the language contained in the four corners of the document.

It is for a court, in the first instance, to decide whether a contract is or is not ambiguous. *See Alexander & Alexander v. These Certain Underwriters*, 136 F. 3d 82, 86 (2d Cir. 1998). Once a court decides that a consent decree is unambiguous, its construction presents "a matter of law" for a court to determine. *K. Bell & Assoc. v. Lloyd's*, 97 F. 3d 632, 637 (2d Cir. 1996). In reaching such a construction, the court must consider the entire contract, in order to give meaning to all its terms and avoid adopting "an interpretation that would render any individual provision superfluous." *RJE Corp. v. Northville Industries Corp.*, 329 F. 3d 310, 314 (2d Cir. 2003).

There is absolutely no ambiguity in the relevant sub-paragraph of the Stipulated Order. Paragraph 89(h) of the Stipulated Order is part of Section VI, which by its express terms applies to both FAA and non-FAA situations. Section VI does not say that all of its subsections except subsection (h) apply to both FAA and non-FAA situations; neither does the express language of Paragraph 89(h) indicate that it applies only during FAAs. The language of the Order is perfectly clear. Ergo, Paragraph 89(h) applies to arrests taking place during both FAAs and non-FAAs. End of story.

In an effort to create some sort of ambiguity where none exists, the City proffers multiple reasons why the plain language of section VI and Paragraph 89 should not be respected. Those arguments are entirely unpersuasive.

The parties chose to lift the term "Red Light Offenses" from a different section (Paragraph 29) of the Stipulated Order; they used in in Paragraph 89(h) as shorthand for the ten types of low-level offenses that are not supposed to be used to remove a credentialed reporter from the street absent senior approval. But that does not incorporate into Paragraph 89(h) anything other than the precise definition of "Red Light Offenses;" nor does it render this subparagraph subject to Section III of the Stipulated Order, which applies to FAAs only. Nothing about the borrowing of this one term undercuts the express language of Paragraph 89, which indicates that Section VI, alone of all the sections of the Stipulated Order, applies in both FAA and non-FAA situations.

The use of the term "Incident Commander" in Paragraph 89(h) is similarly not a persuasive reason to conclude that the plain language of the agreement should be ignored, for two reasons.

First, that term is defined, not in the Stipulated Order, but in the NYPD Patrol Guide. All it means is "the highest uniformed ranking police supervisor assuming command, who has responsibility for overall management of [the] incident in question." *See* NYPD Patrol Guide 213-

04, https://www.nyc.gov/site/nypd/about/about-nypd/manual.page, (last accessed June 17, 2025). The examples used in the patrol guide will often involve large-scale deployment by NYPD – critical situations on NYC Transit; every sort of hazardous material incident; unusual disorder in emergencies – just as FAAs do. But not all such situations qualify as FAAs. For that reason, I cannot conclude, as the City insists, that the phrase "incident commander" is a "term of art" applicable only to FAAs. While it is true that all other references to an Incident Commander that appear in the Stipulated Order are in the context of FAAs, that is easily explained by the fact that every section of the Order other than Section VI/Paragraph 89 applies exclusively to policing during FAAs. However, SectionVI/Paragraph 89 applies by its terms and without any exception to both FAAs and non-FAAs. Since the Patrol Guide provides for the appointment of an Incident Commander in non-FAA contexts, the reference to an Incident Commander in Paragraph 89(h) neither creates an ambiguity nor makes that paragraph applicable only during FAAs.

Second, Paragraph 89(h) provides for two different sources of approval for a low-level ("red light") press arrest – the Incident Commander (senior officer present) or someone from DCPI. The inclusion of an alternative arrest approval mechanism was plainly designed to deal with situations in which there was no Incident Commander on site who could be consulted. Since every FAA is required to have an Incident Commander, the inclusion of DCPI as a source of arrest approval must be read to provide an alternative when there is no such person – i.e., in non-FAA situations, where there might be no Incident Commander.

The City's argument that Plaintiffs misunderstand the traditional scope of the role of DCPI personnel is a non-starter. The City stipulated to an order that by its express terms confers press arrest approval power on DCPI personnel. If that represents a new responsibility for DCPI, it is one that the City has accepted – and for which the City must provide the necessary training.

The use of both of these terms in Paragraph 89(h) must be read in the context of the entire language of Section VI/Paragraph 89. And perhaps the clearest statement in Section VI/Paragraph 89 is that the entire section applies to both FAA and non-FAA situations.

Frankly, this is not even a close call.

That said, I quite understand that the City's concern that (to imagine one example) some drunken reporter who is being arrested for disturbing the peace during a loud and unruly private argument with a friend might unwisely choose to flash his press credentials -- thereby requiring the arresting officer to make a phone call to DCPI in order to get the "all clear" to effectuate a perfectly legitimate low level arrest. But that call can be quickly made and equally quickly disposed of by the (properly trained) DCPI person on duty, who would presumably authorize the removal of the reporter from the scene. Furthermore, it seems to me that the unwise reporter who abused his press credentials in this way would risk losing those credentials – or his job -- and might even become an ugly story in his own right.

But the City did not draft the Stipulated Order to deal with a reporter's abuse of press credentials, and it did not limit Paragraph 89(h) to FAAs. It must live with the document it drafted.

## CONCLUSION

Do I think this agreement could have been drafted more precisely to deal with the possibility of abuse? I certainly do.

Do I think the agreement is ambiguous, notwithstanding the fact that it could have been better drafted? No, I do not.

The plain language in the opening of Section VI makes it abundantly clear that the parties were doing nothing more than incorporating previously-defined terms into a section of the agreement – the one and only section of the agreement – that extended beyond FAAs.

The Plaintiffs' motion is GRANTED. The City should engage with the Plaintiffs to be sure that protocols are drafted that incorporate procedures to be used in connection with press arrests during non-FAA situations.

The Clerk of Court is directed to remove the motion at Docket Nos. 1193 (20 Civ. 8924)(*In re NYC Policing*) and 167 (21 Civ. 6610)(*Gray*) from the court's list of open motions. As the motion has also been filed under the numbers of the other consolidated cases -- in violation of the court's previous order that motions NOT be filed under all case numbers – I need to ask the Clerk to remove all of the following additional motions from the court's list of open motions: Docket # 224 in 20 Civ. 10291 (*Sierra*); Docket #164 in 20 Civ. 10541 (*Wood*); Docket # 187 in 21 Civ. 322 (*People of the State of New York*); Docket # 205 in 21 Civ. 533 (*Sow*); Docket #112 in 21 Civ. 1904 (*Yates*); Docket #105 in 21 Civ. 2548 (*Rolon*).

The consent letter motions asking for sealing in connection with this motion (one motion per case) are all GRANTED. The Clerk is thus also ordered to remove the following motions from my docket: Docket # 1192 in 20 civ 8924 (*In re NYC Policing*); Docket # 223 in 20 Civ. 10291 (*Sierra*); Docket # 161 in 20 Civ. 10541 (*Wood*); Docket # 186 in 21 Civ. 322 (*People of the State of New York*); Docket # 204 in 21 Civ. 533 (*Sow*); Docket # 111 in 21 Civ. 1904 (*Yates*); Docket # 104 in 21 Civ. 2548 (*Rolon*). There is no corresponding motion on the docket in Gray.

However, the matter filed under seal is limited to parol evidence about settlement discussions, which the court did not consider in reaching its conclusion. As a result, there is absolutely nothing in this opinion that should be sealed, and I will file the complaint on the public docket immediately.

Finally all motions seeking to remove the names of various former Corporation Counsel was granted in the main case (In re NYC Policing) some time ago. However, it seems that identical

motions were filed on all dockets. They are GRANTED. Therefore, the clerk should remove the following motions from the court's list of open motions: Docket #221 in 20 Civ. 10291 (*Sierra*); Docket # 161 in 20 Civ. 10541 (*Wood*); Docket # 184 in 21 Civ. 322 (*People of the State of New York*); Docket #202 in 21 Civ. 533 (*Sow*); Docket # 109 in 21 Civ. 1904 (*Yates*); Docket # 102 in 21Civ. 2548 (*Rolon)*; and Docket # 164 in 21 Civ. 6610 (*Gray*).

    I beg the parties not to file under all docket numbers unless it is absolutely necessary. As long as you file under 20 Civ. 8924 any decision will be binding in all the consolidated cases.

Dated: June 18, 2025

                                                              U.S.D.J.

BY ECF TO ALL COUNSEL